BLISS v. WASHOE COPPER CO. et al.

(Circuit Court of Appeals, Ninth Circuit. March 6, 1911.)

No. 1,738.

1. APPEAL AND ERROR (§ 1022*)—REVIEW—FINDINGS OF FACT BY MASTER APPROVED BY TRIAL COURT.

Findings of a trial court, made on conflicting evidence, and affirming those of a master before whom the witnesses testified as to the damage done to farmers by smoke and fumes from a smelter, especially where both the judge and the master had the benefit of a personal inspection of the premises, are to be taken as presumptively correct, and will not be reversed by an appellate court, unless some serious or important mistake has clearly been made in the consideration of the evidence.

[Ed. Note.—For other cases, see Appeal and Error, Cent. Dig. §§ 4015–4018; Dec. Dig. § 1022.*]

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

2. NUISANCE (§ 23*)—ENJOINING LAWFUL BUSINESS—COMPARATIVE INJURIES.
  Complainant, the owner of a farm, which he rented, situated in Deer
  Lodge Valley, Mont., brought suit to enjoin the maintenance and opera-
  tion by defendants of the Washoe Copper Smelter, on the edge of the val-
  ley, on the ground that the fumes and the sulphur and arsenic precipi-
  tated from the smoke from the smelter injured the crops and forage on
  the farm and poisoned the stock thereon, as well as on the other farms
  in the valley within what was called the "Smoke Zone," and made it a
  public nuisance. The suit was really brought in behalf of a large number
  of farmers who were joined in an association. The trial court found, af-
  firming findings of a master, that some injury had resulted to complain-
  ant's and other farms in the valley prior to 1903 for which defendants
  had paid, but that in such year they had reconstructed the plant at large
  expense adopting the best known methods for the purpose. and with the
  effect, of lessening such injury, and that since that time the property of
  complainant and of the other farmers within the Smoke Zone had been
  affected only in a very slight degree: that the smelter had been built at
  a cost of nearly $10,000,000 and treated 7,000 tons of ore per day, being
  two-thirds or more of that produced in the Butte district; that its out-
  put of copper was from 17 to 20 per cent. of all that produced in the
  United States; that the operation of the smelter and the mines tributary
  thereto constituted one of the chief industries of the state on which a
  large part of the population of Butte and Anaconda depended, directly or
  indirectly, for a livelihood and the farmers of the valley for a market;
  that no better location, if as good, could be found elsewhere in the state
  for the smelter; and that its closing or removal to a distance would ne-
  cessitate the closing of most of the mines, owing to the low grade of the
  ore. *Held*, that on such facts. and under the rule that in such cases it is
  proper to consider all the facts and circumstances to determine the equi-
  ties, including comparative damages, the granting of the injunction would
  necessarily operate contrary to the real justice of the case, and that it
  was properly refused.
  [Ed. Note.—For other cases, see Nuisance, Cent. Dig. §§ 55–59; Dec.
  Dig. § 23.*]

Appeal from the Circuit Court of the United States for the Dis-
trict of Montana.

Suit in equity by Fred J. Bliss against the Washoe Copper Com-
pany and the Anaconda Copper Mining Company. Decree (167 Fed.
342) for defendants, and complainant appeals. Affirmed.

The appellant, a citizen and resident of the state of Idaho, commenced this
suit in the court below on the 4th day of May, 1905, against the appellees,
each of which is a corporation of the state of Montana, to obtain an injunc-
tion permanently restraining them from operating a large smelting plant
known as the "Washoe Smelter," situated about a mile and a half southeast
of the city of Anaconda, Mont., and from there treating certain ores con-
taining poisonous substances. In his bill the complainant alleged: His own-
ership of 320 acres of land situated in Deer Lodge Valley, Mont., and about
5 miles in a northeasterly direction from the said smelter. That during the
year 1902 the defendant companies constructed the smelting plant mentioned
on the south slope of Deer Lodge Valley contiguous to a large farming neigh-
borhood, consisting of over 100 square miles of improved farming lands, all
of which is in that portion of Deer Lodge Valley affected by the smoke and
fumes from the said smelter, and which portion is in the bill designated as
the "Smoke Zone." That at all times prior to the construction of the Washoe
Smelting Plant the portion of the valley designated as the "Smoke Zone"
was a rich and fertile farming country, well watered, and well adapted to
raising sheep, cattle, horses, and other live stock, as well as producing large
and valuable yields of wheat, timothy, clover, alfalfa, wild hay, and such
other grains and cereals as can be profitably grown in that latitude, and was

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

also well adapted to the raising of profitable crops of berries, garden truck, vegetables, and other farm products, for all of which there was a ready sale at profitable prices. That a large number of the farmers referred to settled in the valley as early as 1865, and proceeded to cultivate, fence, and improve their lands, and to build many good substantial homes there,' and it became a rich and prosperous neighborhood, and would continue to be such but for the acts of the defendants complained of. That the farmers residing in the "Smoke Zone" number over 100, and own and possess over 50,000 acres of improved tracts, keeping thereon a large amount of stock, horses, cattle, and swine, pursuing the business of farming as a means of livelihood. That all of said farmers are similarly situated as the complainant and are similarly affected by the smoke and fumes from the said smelting plant. That during the summer of the year 1903 the defendants remodeled their said smelting plant, completing such remodeling about September 1st of that year by constructing a large brick stack and connecting it by large flues with the smelting plant, since which time they have been and are now engaged in mining and producing large quantities of ore, amounting to about 7.000 tons a day, which ores contain large quantities of arsenic, sulphur, antimony, copper, and other noxious and poisonous substances, and which ores the defendants there treat, reduce, and refine, thereby causing large quantities of sulphur, sulphuric acid, sulphurous acid, arsenic, copper, and other noxious and poisonous substances to be freed and to be carried through the flues connected with the smelter to the smelter stack and there discharged into the atmosphere, which noxious and poisonous substances are carried by the winds and air currents over, above, and upon that portion of the Deer Lodge Valley known as the "Smoke Zone," and upon the land of the complainant, depositing large quantities of sulphurous acid, sulphuric acid, sulphur dioxide, arsenic, antimony, copper poisons, and other noxious and poisonous substances over the said "Smoke Zone," and more especially upon the complainant's said land, poisoning, burning, and dwarfing the crops growing on the land during the summer season of 1904, and poisoning all the soil in the "Smoke Zone" and the hay, grasses, and grain growing thereon, poisoning all the live stock in the said valley, causing large numbers of horses, sheep, and cattle and swine so poisoned to sicken and a great many to die from the effect of the poisoning, to the extent that the land in the said "Smoke Zone" is rendered wholly worthless for stock raising or farming purposes, so long as the defendants continue to operate their said smelter in the treatment of said ores. That the said precipitations of said poisonous and noxious substances from the said smelter fumes and smoke are insidious and cumulative, and great damage is done before the farmers are aware of the presence of the said poisonous and noxious substances so precipitated, as its presence is only shown by general sickness of live stock, and the general burnt, stunted, and dwarfed condition of the crops and vegetation. That each year, if the smelter continues to be operated, the soil of the said "Smoke Zone" would become more highly impregnated with such poisonous substances, and that finally no crop or vegetation can be produced there. That more than $2,000,000 worth of real and personal property, owned by the farmers, is situated in the "Smoke Zone," and is now being damaged by the smelter fumes and the poisonous ingredients contained therein, and will ultimately be entirely destroyed by the continued operation of the said smelter. That the homes of the said farmers will be destroyed, and that they will be compelled to migrate. That the poisonous ingredients contained in the fumes of the said smelter have killed nearly all the trees in the "Smoke Zone," and have killed and injured the trees and timber for many miles around the plant, rendering Deer Lodge Valley and the country adjacent to the smelter "barren and desert like." That the rental value of the complainant's land prior to the construction and operation of the said Washoe Smelter was $1,000 per annum, and that its present value will not exceed $300 per annum, because of the said noxious and poisonous substances precipitated thereon from the smoke and fumes of the said smelter. That the complainant's land prior to the acts complained of was of the value of $12,000 and was capable of producing large quantities of hay, grain, and other farming products of good quality, and will continue to do so but for the alleged wrongful acts of the defendants, which have al-

ready damaged his land to the extent of $20 an acre. That the crop season of Deer Lodge Valley commences about the 1st of May and continues until about October 1st, and that if the said smelting plant continues in operation during the summer season all the crops in the "Smoke Zone" will either be destroyed or be so injured in quality that they cannot be consumed or sold, and that the damages which will be caused by its continued operation are of such a nature that it would be incapable of correct computation, and that neither the complainant nor the other farmers referred to have any adequate means of arriving at the damages which may be hereafter sustained by the lands and the crops growing thereon. That, in order to prepare damage suits for trial, it is necessary to procure chemical tests of the lands and grasses, as well as the smoke emitted from the smelter, and to procure the services of veterinary surgeons to examine the live stock affected and dying from the mineral poisons emitted from the smelter, and to procure chemical analysis of portions of animals infected by said poisons, and which have died as a result thereof. That it requires several thousand dollars to prepare a suit for trial on the part of any one farmer, and that, as such actions at law would greatly multiply, it would be difficult to obtain qualified jurors to try them, and the expense thereof would be so great that the complainant would be unable to institute or maintain such actions. That each crop season will bring new causes of action in favor of the complainant, with the other farmers mentioned, against the defendants, growing out of the continued operation of said smelter, and that the defendants will continue its operation and alleged wrongful acts complained of unless restrained from so doing.

In an amendment to his bill, the complainant alleged, among other things: That the defendants pretend that the business of smelting and reducing the ores of the character of those being treated at the Washoe Smelter has been carried on at substantially the point where that smelter is located for a period of more than 20 years; whereas, the complainant charges the truth to be that no smelting has been carried on at or near the point where the said Washoe Smelter is constructed at any time prior to its construction there, and that the smelting plant operated by the Anaconda Mining Company and the Anaconda Copper Mining Company, designated as the "Old Works," was constructed at a point north of and one mile distant from the said Washoe Smelter, on the north side of Warm Springs Creek Canyon, where the prevailing winds during the operation of the smelting plant constructed by the Anaconda Mining Company was westerly and northerly over the mountains and foothills lying adjacent to the aforesaid "Smoke Zone," and precipitated the sulphur, sulphuric acid, sulphurous acid, arsenic, copper, and other noxious and poisonous substances, which were freed from the ores being treated at the said Old Works, upon the foothills and mountains lying northerly and westerly, and adjacent to that portion of Deer Lodge Valley termed the "Smoke Zone," and that no known damage was caused by the operation of the smelting plant known as the Old Works. That the site of the Old Works is and was a fit and convenient place for the construction and operation of the said Washoe Smelting Plant for the reason that the prevailing winds are northerly and westerly over the foothills and mountains, and cause no damage to the complainant or to any property situated in that portion of Deer Lodge Valley referred to as the "Smoke Zone." That the defendants further pretend that no protest or objection was made to the construction of said Washoe Smelter, but that the truth is that the complainant and the other farmers residing in the "Smoke Zone" had no knowledge or notice that the prevailing winds would carry the smoke and fumes from the said Washoe Smelter over the lands situated in the "Smoke Zone," but believed that they would carry the said smoke and fumes from said smelter in the aforesaid northerly and westerly direction over the mountains and foothills, as had been done during the operation of the Old Works. That the defendants pretend that the city of Anaconda is the most suitable and appropriate place for the operation of their said smelting plant; whereas, the complainant alleges that several large copper smelting plants are being operated in the state of Montana, treating the same kinds and classes of ore as are now being treated in the said Washoe Smelter, without objection or litigation, and where little or no damage can be done, as the said smelting plants are not situated contiguous to or near

any farming country—that is to say, at the city of Butte, at the city of Great Falls, and at the city of Helena—and that there are numerous places in the state of Montana where smelting plants could be operated similar to the said Washoe Smelter, for the treatment of such ores, without damage or injury to the adjacent country. That the defendants allege that they have used all reasonable means to prevent the damage complained of; whereas, the complainant alleges the fact to be that the poisonous substances complained of can be precipitated and impounded at the said Washoe Smelter, with very little extra cost to the defendants in the treatment of their ores.

The defendants by their answer admit the construction of the Washoe Smelter in the year 1902, at the place mentioned in the bill, and its subsequent continuous operation, except during a period of several months in the summer of 1903, during which its operation was discontinued while the plant was being remodeled and connected with certain large, newly constructed flues, and the new smokestack thereinafter referred to. Defendants admit the remodeling of the plant as stated in the bill, which they allege cost many millions of dollars; the reason for such remodeling and expenditure being alleged substantially as follows: That after the Anaconda Copper Mining Company had abandoned its old works, hereinafter referred to, and transferred its operations to the Washoe Smelter, complaint was made by nearly all of the farmers within the territory referred to in the bill as the "Smoke Zone" that such large quantities of sulphur, arsenic, copper, and other obnoxious substances were discharged in the air through the several smokestacks with which said smelting plant was then operating that the crops and live stock within such territory were being poisoned and injuriously affected, to the great damage of their owners, and that claims for damage, on account thereof, to the amount of several hundred thousands of dollars, were presented by such ranchmen to the Anaconda Copper Mining Company; and that inasmuch as the ores being treated were copper ores, and were known by the defendants to contain large quantities of copper and some quantities of sulphur and arsenic, the defendant Anaconda Copper Mining Company investigated the complaints, and, although not satisfied that any considerable damage was being caused as claimed, nevertheless compromised and settled such claims, paying out on such settlements an amount exceeding $300,000. That in the course of such investigation the said company became satisfied that, by the construction of large flues with dust chambers and the erection of a new stack upon a high elevation at some distance from the smelting plant, a very large percentage of the substances theretofore escaping into the air and by the farmers claimed to be damaging to their stock and crops could be retained and prevented from escaping and being carried over or upon the lands of the farmers, and that, for the purpose of effecting that result and of avoiding any damage to lands, animals, or crops within the territory referred to as the "Smoke Zone," the said remodeling of the plant was effected and the use of the old smokestacks discontinued. That the effect of the remodeling and the use of the new flues, dust chambers, and the new smokestack was to discontinue and prevent the discharge into the atmosphere of a very large part and most of the dust and other substances complained of which had theretofore been discharged into the air from the smokestacks. That some quantities of the substances mentioned are still discharged into the air through the new smokestack, and that the smoke therefrom containing such substances is carried and disseminated by air currents over a very large area of country, including at times the territory referred to in the bill as the "Smoke Zone"; but the defendants deny that such substances are carried or disseminated over the said lands in quantities sufficient to injure in any degree whatever the lands, vegetables, live stock, or other property within any of the territory mentioned, and deny that the operation of the said Washoe Smelter, since its remodeling, has occasioned any inconvenience, discomfort, annoyance, or loss of any kind to the complainant or to any other persons residing or owning property within the territory referred to as the "Smoke Zone," and deny that the continued operation of the said plant will or can injuriously affect in any manner such persons. That the defendants have, regardless of cost, adopted the best and most modern appliances and means and methods of treating and reducing the ores which are treated at their

smelting plant. not only for the purpose of effecting the greatest possible·sav-. ing of the valuable contents of such ores, but also to prevent possible annoy- ances and injury to the inhabitants and property owners of the territory re- ferred to in the bill, and aver their willingness to continue to do all within their power to effect such results in the future. That there is at the present time no method known by which ores of the character now being treated by the said smelting plant can be treated with less contamination of the air or less discharge into the air of the substances complained of, and they deny that there has been any negligence in the construction or operation of their said plant.

The defendants admit that the said Washoe Smelting Plant has been and is being operated by the defendant Anaconda Copper Mining Company, and deny that it has ever been operated, or that any ore has ever been treated at it by the defendant Washoe Copper Company, and they admit that the de- fendant Anaconda Copper Mining Company has treated, in addition to its own ores, the ores of other corporations and ores purchased by it. They deny that the Deer Lodge Valley, or any portion thereof, designated in the bill as the "Smoke Zone," was ever a rich or fertile farming country. They allege that the soil of the valley is for the most part thin and poor, and that it is in many places heavily charged with alkali, and they deny that it is well adapted to stock growing, but admit that some parts of the said valley are fairly adapted to the growth of hay, vegetables. and to the care of live stock. . The defendants admit that since the 1st day of September, 1903, the defend- ant Anaconda Copper Mining Company has been treating and reducing at the Washoe Smelter large quantities of ore, upon some days as much as 7,000 tons, though not always so much, and that the ores so treated contain much copper and some quantities of arsenic and sulphur. They deny that any con- siderable or injurious quantities of sulphuric acid, sulphurous acid, sulphur dioxide, arsenic, antimony, copper, or of any one of such substances, or of any other noxious or poisonous substances, have been deposited upon the lands of the complainant, or upon any other lands within the territory de- scribed as the "Smoke Zone," or that any crops in the year 1904 were, on ac- count of any such deposit or the operation of the said smelting plant, poi- soned, dwarfed. burned, or in any manner injured, or that any live stock died or was made sick, or was to any extent injured by reason of any of the sub- stances aforesaid escaping from the said smelting plant, or that the Deer Lodge Valley, or any portion thereof, has been rendered worthless, or to any extent affected for·stock raising or for farming purposes, or that the same will be to any extent affected for such uses by the operation of the said smelt- ing plant. They deny that $2,000,000 of real and personal property are sit- uated within the said "Smoke Zone," and allege that the total value of all personal and real property within that territory is less than one quarter of that sum. They deny that the Deer Lodge Valley, or the country adjacent thereto, is barren or desert like as the result of the operation of the said smelter, or from any cause. They allege they do not know and cannot state . what the rental value of the complainant's land was prior to the construction and operation of their smelter, or what it now is. They deny that the said land, or that any of the land mentioned, has been rendered less profitable or useful by reason of the descending thereon of the smoke or fumes from their smelter, and deny that the products of such lands have been rendered innu- tritious or unwholesome for feeding purposes, or that the market value there- of has in any respect been impaired or affected. They allege that during the time mentioned in the bill all products of the lands within the territory de- scribed as the "Smoke Zone" have found a ready market and have been dis- posed of at high prices when offered for sale. They admit that unless re- strained by injunction the operation of their smelter will be continued as at present, and allege that each of the defendants is solvent and amply able to respond in damages to the full extent of many times the total value of all of the lands and of all of the personal property within the said "Smoke Zone." They deny that, in case any damage should at any time be sustained by the owner of any property within that territory, it will be necessary for the per- son so damaged to expend any large amount of money or be at any great trouble or expense in making proof of such loss, even if litigation should be

necessary; and they further aver that the defendant Anaconda Copper Mining Company is not only able, but willing without litigation, to pay all damages which have been or may be sustained to property, arising from the operation of the said smelter, when reasonably satisfied that such damages have been caused.

Further answering, the defendants aver: That the business of smelting and reducing of ores of the character now being treated at the said Washoe Smelting Plant has been carried on extensively at Anaconda, in Deer Lodge county, and at substantially the point where the said Washoe Smelter is located, for a period of more than 20 years, and without any complaint or objection upon the part of the complainant or of any farmers or property owners within the territory called the "Smoke Zone" prior to the year 1902. That the business now being carried on by the defendant Anaconda Copper Mining Company, as stated, has been carried on by it continuously since the year 1895; the same being conducted prior to the year 1895 at certain works erected about the year 1884 and in subsequent years, by a Montana corporation known as the Anaconda Mining Company. That a great majority of the residents of Deer Lodge Valley and of the said "Smoke Zone" have become such since the construction of such works by the Anaconda Mining Company. That, prior to the construction of such works by that company, the residents of Deer Lodge Valley were few in number, widely scattered, and practically without any market for their farm or other products, or for their live stock. That about the year 1884 the Anaconda Mining Company was the owner of large and valuable mining claims in the vicinity of the city of Butte, in Silver Bow county, Mont., which claims were being extensively worked and were producing large bodies of ore, and that it became necessary that extensive reduction works be constructed for the treatment of such ores, and that the point where the city of Anaconda now stands was selected as a fit and appropriate place for the construction of such works because of the natural facilities offered for the conduct of the business of smelting ores, and without any objection or protest on the part of the complainant or his predecessors in interest, or of any other persons residing anywhere within the Deer Lodge Valley, the Anaconda Mining Company expended, with the knowledge upon the part of all of such persons at the time of such expenditure, the sum of several millions of dollars in the construction of such works. That upon their completion, and about the year 1884, the Anaconda Mining Company began to treat, and continuously thereafter and down to the year 1895, and the transfer of the said works to the defendant Anaconda Copper Mining Company, did treat, several thousands of tons of ore per day at said works. That said ores were of substantially the same character, containing the same substances as the ores now being treated, and that there was during the whole of such operation discharged into the atmosphere from the smokestacks of the said works sulphur, arsenic, copper, and the substances generally complained of by the complainant which, during all of said time, were carried by the currents of air, as the same now are, over the land of the said valley and the lands of the said "Smoke Zone" without objection, protest, or complaint on the part of the owners thereof. That from time to time, from the year 1884, down to the time of the erection of the said Washoe Smelter, many repairs, additions, and improvements were made to the old works, many hundreds of thousands of dollars being expended in the making thereof, all with the knowledge of and without any objection upon the part of the owners of the land alleged in the complaint to belong to the complainant, or owners of other lands in the valley, and without any suggestion of damage on the part of any of such persons on account of such smelting operations. That, at the time of the commencement of the erection of such old smelting works, the present site of the city of Anaconda was vacant, unoccupied land; but that, in consequence of such works and the employment of many men in and about the same, a village was founded which grew into the present city of Anaconda, wherein, according to the best information of the defendants, resides now a population of from 10,000 to 12,000 people. That the growth of the city of Anaconda has been gradual, and the same has been mainly caused by the continued conduct of such smelting business. That nearly the whole of the population of the city of Anaconda is dependent directly or indirectly for means of subsistence

upon the continued operation of the said Washoe Smelter. That nine-tenths of the inhabitants of said city of Anaconda would be compelled to remove from the same in order to obtain a livelihood if said smelter should be permanently closed. That the city is substantially built, and that many hundreds of thousands of dollars have been expended in the construction of permanent homes by residents of the city and in the erection of public buildings. That there is no reason to believe that any of the inhabitants of that city would have established their homes there if the same had not been selected, as above stated, by the defendant Anaconda Mining Company for the conduct of its said smelting business. That the city of Anaconda has furnished, since the year 1884, the principal market for the products of the Deer Lodge Valley. That nearly all of the hay, alfalfa, grains, and vegetables produced since that date in said valley find a ready market, at high prices, in said city of Anaconda, and that the continual enlargement of the market at Anaconda, as a result of the growth of the city and the increase of such smelting operations, has led to corresponding increase in the production of the crops in the Deer Lodge Valley, and particularly in that part thereof called the "Smoke Zone," with a corresponding increase of revenue to the owners of such lands. That, aside from the city of Anaconda, the only near market for any of the products of the said valley is the city of Butte, in the county of Silver Bow, Mont. That in the year 1895 the defendant Anaconda Copper Mining Company was organized for the purpose of acquiring the properties of the Anaconda Mining Company aforesaid, and in said year all of the properties and rights of the Anaconda Mining Company were, for a valuable consideration, sold and conveyed to the Anaconda Copper Mining Company, which at once entered into the occupation and possession of the same, and continued the aforesaid business of mining and smelting ores. That the smelting of ores was continued, without substantial change, by the Anaconda Copper Mining Company at the old works until the completion of the Washoe Smelter in the year 1902, when it leased of the Washoe Copper Company said smelting plant for the purpose of continuing its aforesaid business, and, after entering into the possession of the Washoe Smelter in that year, said Anaconda Copper Mining Company has continued the said business of conducting its smelting operations at the Washoe Smelter. That, having transferred its smelting operations to the Washoe Smelter, the Anaconda Copper Mining Company took down and demolished the old works, and now has no other available means of smelting or reducing the ores mined by it or by the other companies afterwards referred to than by the use of the Washoe Smelter. That the construction of the Washoe Smelter occupied several years of time and involved an expenditure of several millions of dollars. That the facts and transactions already stated were, as they occurred, well known to all of the inhabitants of the Deer Lodge Valley, to the complainant, and to his predecessors in title. That the capital stock of the Anaconda Copper Mining Company is owned by many hundreds of persons residing in many states of the Union, and in foreign countries, who have acquired and paid for the same with knowledge of the long and continued conduct of such smelting business at Anaconda, and of the fact that the same had been so long conducted without protest or objection on the part of the owners of lands in the vicinity, and in the belief that the said business would be permitted to continue without protest or objection. That the ores treated at the Washoe Smelter are mined in the vicinity of the city of Butte, mainly from mines owned by the Anaconda Copper Mining Company, the Trenton Mining & Development Company, which has succeeded to the properties formerly owned by the Colorado Smelting & Mining Company, the Butte & Boston Consolidated Mining Company, the Parrot Silver & Copper Company, and the Washoe Copper Company. That, in addition to the ores mined by these companies, some other ores and some custom ores are smelted. That the city of Butte has a population of 60,000 people, or about one-fifth of the entire population of the state of Montana, and has grown from a small mining camp, having a population of a few hundred people, within the last 30 years, owing to the opening up and development of its copper mines. That the entire population of the city of Butte depends directly or indirectly upon the continued operation and production of said mines for their means of livelihood. That the mines aforesaid

employ many thousands of persons, and in addition thereto a great number of persons have established different branches of business and industry in the said city of Butte, all of which said business is dependent upon the continued operation of the mines. That the city is substantially built, and many millions of dollars have been spent by the inhabitants of the city in the erection of permanent business blocks and residences in said city. That, since the erection of the reduction works by the Anaconda Mining Company at Anaconda, the value of the product of the Butte mines has exceeded the sum of $500,000,000, and at the present time the product of the said mines has a value of about $45,500,000 per annum. That about three-fourths of all of the ores mined at Butte are treated and reduced at the Washoe Smelter, and that if the latter should be closed no present means exists by which such ores could be treated, and their production would need to be discontinued. That all of the country surrounding the city of Butte and the city of Anaconda is mountainous in character, sparsely settled, offering means of livelihood to but a comparatively few people. That the area of agricultural land is very limited, and the market for such products as are raised upon such agricultural lands is practically limited to the cities of Butte and Anaconda. That there are employed in the said reduction works, and in the mines of the companies above specially named, an average of about 8,000 men per month, all of whom are absolutely dependent for their livelihood and continued employment upon the continued operation of said mines and smelter. That the said mining companies and the said smelting plant pay to the men employed therein more than $7,000,000 per annum, and that the said mining companies expend approximately $1,500,000 per annum for coal, more than $1,000,000 per annum for coke, more than $200,000 per annum for lime rock, approximately $500,000 a year for lumber, $500,000 a year for machinery, and $350,000 a year for freight. That a large percentage of the said supplies are furnished from mines, factories, mills, and quarries located in the state of Montana, all of which furnish employment to additional thousands of men residing in different parts of the state, and that to a very large extent the state of Montana outside of the cities of Butte and Anaconda is dependent for its continued prosperity and industry upon the continued operation of said mines and said reduction works. That neither the said Anaconda Copper Mining Company nor any of the said companies, if prevented from reducing and smelting its ores at the said Washoe Plant, can find any more suitable place in the state of Montana to conduct the business of smelting or reducing ores, or any other place within the said state where the said industry could be carried on with less injury to agricultural lands or to persons or property than where the same is now located, and that if it were necessary to remove the said ores from the state of Montana to reduce, or dispose of the same, the cost of such removal would be so great that further mining of such ores would become impracticable, and that it would be necessary to discontinue such mining business. That the city of Anaconda is the county seat of the county of Deer Lodge. That the total assessed value of the real and personal property of said county for the year 1904 was $8,120,826. That of such amount the sum of $4,058,573 was assessed against the property of the defendants. That the granting of the injunction prayed for would render all of the property of the defendants within said county valueless and would cause such a depreciation in other property now subject to assessment that it would be impracticable to continue the county organization of the county of Deer Lodge with such sums as might be raised by the assessment of the property therein. That the city of Butte is the county seat of the county of Silver Bow. That of the taxes annually collected in that county, about 40 per cent. is collected from the assessment of the mines and the net proceeds of the mines therein. That the county of Silver Bow furnishes about 25 per cent. of the total taxes collected by the state of Montana, and that, if the relief prayed for by the complainant be granted, all the property within the county of Silver Bow would be depreciated to such an extent as to seriously impair the revenue of the state and to render impracticable the continuance of the local county government. That the granting of the relief prayed for would work permanent and irreparable injury to the complainant and to all others owning property within the territory called the "Smoke Zone," which injury would re-

sult directly from the destruction of the market for the products of such lands and in loss of market value to the lands, and that the damages which would be sustained by the complainant and the owners of such lands would, with respect to each of said persons, be greatly in excess of any possible damage that they may sustain by reason of the continued operation of the said Washoe Smelter as it is now being operated. That the complainant, his predecessors in title, and all other owners of land within the territory designated as the "Smoke Zone," have for years stood by and watched the growth and development of the said smelting industry, the investment of millions of dollars by the said corporations in the development of the said mines and the construction of said smelters, the investment by citizens of Anaconda and Butte of millions of dollars in the development and permanent growth of those cities, with full knowledge thereof, and well knowing that the ores, so being mined and treated contained copper, sulphur, arsenic, and other substances complained of, and that the process of treatment necessarily caused elimination and discharge into the atmosphere of such substances, well knowing what, if any, effect such discharge did and would have upon vegetables and animal life and the productiveness of the soil, and well knowing that said sums were being continually invested, and that the amount so invested was continually increasing; and yet they have failed and neglected during all of said years, until, as above stated, to complain, protest, object, or in any manner notify such corporations or persons of any damage sustained, or any objection upon their part to the conduct of such business, well knowing that said corporations and persons were constructing such works, developing such mines, erecting such buildings, making such improvements, and investing their money therein in the belief and in reliance upon the acquiescence of any consent to the continued conduct of such mining and smelting business and upon the part of the complainant, his predecessors in title, and all other owners of land or personal property within the territory designated the "Smoke Zone." And that the complainant is and ought to be barred and estopped from claiming relief in equity by reasons of his laches and delay in the premises.

Further answering, the defendants deny that no smelting has been carried on at or near the point where the said Washoe Smelter has been constructed, prior to its construction. They deny that there has been any substantial difference between the location of the old works of the Anaconda Mining Company and the Anaconda Copper Mining Company and the site of what is designated in the bill and the answer as the "Washoe Smelter," and allege the fact to be that the old works were situated upon the northerly side of Warm Springs Canyon, and that the Washoe Smelter is on the southerly side of that canyon; that the said site of the Washoe Smelter was selected by the defendants as a more suitable smelting site than that of the old site for the reason that the elevation of the ground was and is higher and the gases and smoke emitted by the defendants in the operation of the said smelter would be less likely to be disseminated in such manner as to cause injury to the complainant, or to any other farms within the territory designated in the bill as the "Smoke Zone." The defendants admit that no appreciable damage was done by the operation of the smelting plant constructed by the Anaconda Mining Company and known as the "Old Works," and allege that no known damage is caused by the operation of the said Washoe Smelter. They admit that the site of the old works is and was a fit place for the construction and operation of a smelting plant, but deny that the present site is any more unsuited for the erection and operation of the smelter than was the site of the old works. The defendants deny that the complainant and the farmers residing in the "Smoke Zone" had no knowledge or notice that the prevailing winds would carry the smoke and fumes over the lands situated in the "Smoke Zone," and allege the fact to be that the conditions of the operation of the said smelter were well known to the complainant and to all the other farmers residing in the "Smoke Zone" at the time when the defendant Washoe Copper Company began the construction of said smelter, and that, notwithstanding such knowledge of the conditions which would attend the operation of said smelter, no protest was ever made by the complainant or by any of the farmers residing within the Deer Lodge Valley. The defendants deny that there has been any sub-

stantial change in the treatment of ores since the completion of the Washoe Smelter from what there was in the smelting of ores by the Anaconda Mining Company and the Anaconda Copper Mining Company at the old works; aver the fact to be that, in so far as any change has been made, the changes have all been for the purpose of improving the system of smelting so as to effect greater savings of the valuable contents of the ores treated at the said smelter, and for the purpose of relieving, in so far as it is possible to do so, the operation of the smelting plant from any annoyance or injury to those who reside in the neighborhood of the said smelter, and particularly within the area of what is known as the "Smoke Zone."

The defendants admit that several copper smelting plants are being operated in the state of Montana, and that some of such plants are treating practically the same kind of ores as are being treated in the Washoe Smelter. They deny that such treatment is attended without objection or litigation, and aver that nearly all of the smelters of the state have been subject to annoyance, harassment, and unfounded litigation upon the part of persons similarly situated as are the farmers in the "Smoke Zone." They deny that at the city of Butte, the city of Helena, the city of Great Falls, or elsewhere in the state of Montana, the smelting operations could be carried on any more conveniently or with less damage to the adjacent country than at the site of the said Washoe Smelter. They deny that the natural conditions are such that a smelting plant of the capacity of the Washoe Smelter could be operated at the city of Butte, or at the city of Helena, or at the city of Great Falls, for the reason that there is insufficient water supply in those places, and that the other conditions surrounding the locality are such as would preclude the operation of a smelting plant of the character and size of the Washoe Smelter. They deny that arsenic, sulphuric acid, sulphurous acid, or any of the other deleterious substances mentioned in the bill can be precipitated or impounded at said smelting plant at any cost or with better results than the defendants are now doing at the site of the said smelter. The defendants deny that the suspension of operations of the Washoe Smelter would not cause serious interference with the residents of the state of Montana, or with the revenues of that state, or the counties of Deer Lodge or Silver Bow. They deny that, in the event of the granting of the injunction prayed for, the suspension of operations would be temporary and of short duration. They deny that the moving of the said smelting plant to the site of the old works, or to any point in the state of Montana, could be done without damage to the inhabitants of the state, and deny that it would be possible to move the said plant from one point to another, and aver that, by reason of the character of its construction, the entire plant would be practically destroyed, in the event of the defendants being compelled to move; that only a small portion of the entire cost of the said plant consists of materials, machinery, etc., which is portable; and that by far the greater percentage of the cost of constructing the said plant consists of masonry work, erection of smelters, foundations, buildings, and other appurtenances necessary for carrying on and conducting the said plant, the value of which would become totally lost if the defendants or either of them were obliged to move to some other place.

Replication having been made by the complainant, the cause was referred by the court below to its standing master in chancery, to take the evidence therein, and to report his findings of fact thereon as advisory to the court. This was done, resulting in the taking of the testimony of a vast number of witnesses on behalf of the respective parties, the introduction in evidence of a vast number of exhibits on behalf of each party, the personal inspection of the premises by both the master and the trial judge, accompanied by the counsel for the respective parties and by some of the expert witnesses on each side, and, finally, after elaborate argument by the respective counsel, findings of fact were made by the master, which were, in the main, approved by the judge, and in the ultimate decision of the trial court in favor of the defendants.

The findings of the master were as follows:

"At the time of the filing of the bill of complaint in this cause, the complainant, Fred J. Bliss, was, and now is, a citizen and resident of the state

of Idaho, and has been since the 21st day of March, 1903, and now is, the owner in fee simple, and in possession of the following described lands and premises, situated in Deer Lodge Valley, county of Deer Lodge, state of Montana, to wit: The west one-half of the northwest quarter of section 26, and the east one-half of the northeast quarter of section 27, and the east one-half of the southeast quarter of section 22, and the west one-half of the southwest quarter of section 23; all in township 5 north, range 10 west of the principal meridian of Montana; containing in all 320 acres.

"(2) The defendants, the Anaconda Copper Mining Company and the Washoe Copper Company, were at the time of the filing of the bill of complaint in this cause, and now are, corporations created and existing under the laws of the state of Montana, with their domiciles in said state. During the year 1902, the defendant Washoe Copper Company constructed a large smelting plant on section 12, township 4 north, range 11 west, in Deer Lodge county, Mont., on the slope of the mountains west of the Deer Lodge Valley, about 1½ miles southeast of the city of Anaconda, and contiguous to a large farming and grazing region in said valley, which smelting plant is known as the 'Washoe Smelter,' and is situated about 5 miles in a southwesterly direction from the before mentioned lands of the complainant. The Washoe Copper Company, defendant, ever since has been, and now is, the owner of said smelter; and the Anaconda Copper Mining Company, defendant, is and has been at all of the times since the construction of said smelter engaged in operating the same in the reduction and treatment of ores.

"(3) The business of smelting and reducing ores of the character now being treated at the 'Washoe Smelter' has been carried on extensively at Anaconda, Deer Lodge county, Mont., for a period of more than 20 years, without any complaint or objection whatever on the part of the residents or property owners of the Deer Lodge Valley prior to the year 1902.

"(4) The said business now being carried on by the Anaconda Copper Mining Company, defendant, has been carried on by it continuously since the year 1895; the same having been conducted and carried on prior to the year 1895 at certain works, known as the 'Old Works,' erected in the years 1883 and 1884 by a corporation organized under the laws of the state of Montana, under the name 'Anaconda Mining Company.' In the year 1895 the defendant Anaconda Copper Mining Company acquired all the properties and rights of the Anaconda Mining Company, and at once entered into the possession and occupation of the same, and since that time has continued the aforesaid business of mining and smelting ore. Briefly stated, the facts are as follows:

"About the year 1884 the Anaconda Mining Company was the owner of large and valuable mining claims in the vicinity of the city of Butte, Silver Bow county, Mont., which claims were being extensively developed and worked, and producing large quantities of low-grade ores, and it became necessary that extensive reduction works be constructed for the successful treatment of the same. A large portion of said ores were and are low-grade in character, over 90 per cent. of said ores were and are of such character that, in order to reduce the same and extract the metal contents thereof, it was and is necessary to first concentrate the same by the use of large quantities of water, and that without such concentration of said ores it would be impossible to operate said mines at a profit. Prior to the location of said 'Old Works' at Anaconda, Mont., extensive investigations were carried on throughout the state of Montana, for the purpose of locating points where sufficient water could be obtained, and other natural facilities afforded for the operation of such works, and the point where the city of Anaconda now stands was selected as the most fit and appropriate place for the construction of such works because of the facilities there afforded for the treatment and reduction of said ores. That without any objection or protest on the part of the complainant or his predecessors in interest, or any other persons, the Anaconda Mining Company proceeded to construct said smelting works, and expended in connection therewith large sums of money aggregating several millions of dollars, and, upon the completion of said works in the year 1884, said company began to treat and continuously thereafter, down to the year 1895, and the transfer of said works to the defendant Anaconda Copper Min-

ing Company, did treat, several thousand tons of said ores per day at said works, which said works were located upon the north bank of Warm Springs creek at a point one mile northerly from the present 'Washoe Smelting Plant.' That from time to time from the year 1884, down to the time of the erection of the 'Washoe Smelter,' many repairs, additions, and improvements were made to the 'Old Works,' and many hundreds of thousands of dollars expended in making thereof, all to the knowledge of, and without objection on the part of, the owners of the land now owned by the complainant or other landowners in the Deer Lodge Valley, and without any suggestion or claim of damage on account of such operation of said smelter. At the time of the construction of said 'Washoe Smelter,' it was deemed necessary to construct a new smelting plant upon modern and more economical lines than said 'Old Works' had been constructed, for the purpose of reducing said ores of the defendant companies and other mining companies, mined at the city of Butte, Mont., and investigation into available sites within the state of Montana was made, and after a thorough investigation the present site of the 'Washoe Smelter' was determined upon as being the most available and suitable site in the state of Montana for said purpose, and the 'Washoe Plant' was constructed by said Washoe Copper Company for the purpose of taking the place of the said 'Old Works,' and to continue the reduction of said ores in a modern and more economical manner. Having transferred its smelting operations to the 'Washoe Smelter,' the Anaconda Copper Mining Company took down and demolished the 'Old Works,' and now has no other available means of smelting or reducing the ores now being treated and smelted by it than the use of the 'Washoe Smelter.' The construction of the 'Washoe Smelter' occupied several years of time and involved the expenditure of about $9,500,000.

"(5) The said ores treated and smelted as aforesaid since the year 1884 at Anaconda, Mont., have been and are sulphide copper ores containing large quantities of sulphur and arsenic, certain quantities of which substances, in various forms, during the processes of smelting said ores, have been, and now are being, released and discharged into the atmosphere and disseminated by the changing air currents over various and indeterminate areas of territory.

"(6) That ever since the construction of the said Washoe Smelter the defendants have been and now are engaged in mining large quantities of said ores amounting to several thousand tons per day, all of which said ores have been treated and smelted in said Washoe Smelter for the purpose of obtaining the metal values therefrom.

"(7) That during the period of time from between the 1st day of February, and about the 1st day of September, of the year 1903, the defendants remodeled the said smelting plant and reduction works, known as the 'Washoe Smelter,' and completed such remodeling by the 1st of September, 1903, by construction of a large brick stack and connecting the same by means of flues with said smelting plant. That, at the said 'Washoe Plant,' prior to the said remodeling thereof, the said sulphur and arsenic fumes emanating therefrom were carried out into the atmosphere by means of four chimneys, each about 225 feet in height, and constructed on a level with said smelting plant approximately, so that the said emanations discharged into the air at a height very little above said smelting plant, and close to the buildings in which they were produced. The said stacks in use before said remodeling, as aforesaid, were of the same general character and construction as those in use at any other smelting plant where similar ores were being reduced at that time.

"(8) That during the period between February 1, 1902, the date of the first operation of the Washoe Plant by the defendant Anaconda Copper Mining Company, and the 1st day of February, 1903, when the construction of said new flues and stack was commenced, complaint was made by many of the farmers and ranchmen within the said Deer Lodge Valley that such large quantities of sulphur and arsenic were discharged into the air, through the several smokestacks with which said smelting plant was then operated, that the crops and live stock within said valley were being injuriously affected and poisoned to the great damage of the owners thereof, and claims

186 F.—51

for damages on account thereof, aggregating in amount several hundreds of thousands of dollars, were presented by said farmers and ranchmen to the defendant Anaconda Copper Mining Company. That, as the said ores being treated in said smelting plant were known to contain quantities of sulphur and arsenic, the defendant Anaconda Copper Mining Company investigated said matter, and, upon its investigators reporting that damage was being done to said farmers and ranchmen, the said Anaconda Copper Mining Company compromised and settled the said claims, paying out on said settlement an amount exceeding the sum of $330,000. That with the intent to prevent, if possible, any further damage being caused, or further claims for damage being made, the said Anaconda Copper Mining Company, at great expense, caused to be made, by the best and most competent expert assistance obtainable, investigations to determine methods and means by which the said noxious substances could be caught and retained from the said gases and smoke to as large an extent as possible, and to so scatter and disseminate the remainder that escaped that, if possible, no damage might be caused thereby. As a result of such investigations, it was determined that the best feasible method of accomplishing such purpose was by the construction of large flues with dust chambers for the purpose of collecting the solid particles, as far as possible, from the said smoke, and by the erection of a high stack upon an elevation at some distance from the smelting plant aforesaid, in order that the said fumes escaping into the atmosphere might be discharged at as high an elevation as possible, and thus become widely disseminated and diluted before coming in contact with any of the ranches in the valley.

"In order to carry out the result arrived at by virtue of the said investigations, the use of the old smokestacks at said smelting plant was discontinued, and the defendant companies began the construction of the large stack before referred to, and of enormous flues to connect said stack with the various portions of the smelting plant, wherein gases and other emanations were created in the operation of reducing said ores. That, carrying out the plan aforesaid, an elevation at some distance from the smelting plant was selected upon which the chimney was erected; said chimney being of brick construction upon a concrete base, and of the following dimensions: Height of chimney above base, 300 feet; height of chimney above nearest point in the valley to smelter, about 1,100 feet; diameter of chimney at base, 31 feet and 6 inches; diameter of chimney at top, 30 feet inside. This chimney was connected with the smelting plant proper by a double system of flues running from the base of the chimney toward the smelting plant for a distance of about 1,000 feet. These double flues connected with the chimney at opposite sides at the base of the stack, and are constructed partially by excavating large cuts in the hill, lining the same with brick, and by arched overhead construction, and are 60 feet in width and about 35 feet each in height, inside measurement. At the end of the 1,000 feet of construction of double flues, and connected therewith, is a single flue which is 60 feet in width, and about 35 feet in height. This single flue is about 1,300 feet long, and at the end farthest from the stack is connected with separate flues and dust chambers running to what are known as the reverbatory, the roaster building, the blast furnaces, and the converter plant, respectively; these being the respective plants in which all gases and emanations from the smelting operations are produced. Beneath the main flue and the double flues there has been excavated tunnels through which cars are run, and the flue dust catching capacity of these large flues remains practically unimpaired.

"The respective plants in which the gases and fumes are generated are connected, as aforesaid, with this large dust flue by chambers, and separate flues which are of the following dimensions: Blast furnace chamber is 250 feet long by 40 feet in height, by 40 feet in width; the roaster dust chamber is 290 feet long, by 40 feet in height and 40 feet in width; the converter dust chamber is 260 feet long by 40 feet in height, and 40 feet in width; the reverbatory dust chamber has the same dimensions as the blast furnace flue. All of the smoke and gases and other emanations from the said smelting

plant pass through these various dust chambers and flues up to the main stack, and go to the top of the stack and thence into the atmosphere. This system of flues and chambers was constructed and put into operation at an expenditure by the defendant companies of approximately the sum of $750,000. In addition to the foregoing improvements, the defendant companies also constructed, adjacent to the large flue heretofore described, an arsenic plant, containing three furnaces for treating arsenic, for the purpose of separating the arsenic from a portion of the flue dust before the flue dust is returned for treatment in the smelting plant, and this arsenic plant has been operating continuously ever since its erection. That as a result of the foregoing improvements, made for the purpose of rendering the smoke and other emanations from said smelting plant harmless in character, it is found that the improvements thus made were constructed along the best known lines for accomplishing the purposes intended, and that the defendant companies have, regardless of expense, endeavored, by these improvements to render the smoke, fumes, and emanations from said smelter harmless. That the steps thus taken by the defendants in this case are far greater and more extensive in character than has been done by any other smelter in existence, and that the effect of the remodeling of said plant and the use of the said flues, dust chambers, and stack is to prevent and discontinue the discharge into the atmosphere of much of the dust containing the substance complained of, which had theretofore been discharged into the air from the smokestacks of the plant, and to disseminate and scatter by air currents at a great height over a large area of country the fumes and whatever dust the same still contained which was not removed therefrom, and that thereby the said smoke, fumes, and emanations from said plant were and are rendered less harmful than was the case before said improvements were made.

"(9) That commencing on or about the 1st day of September, 1903, when said defendants completed the remodeling of said smelting plant, as aforesaid, and ever since said time, the defendant Anaconda Copper Mining Company has been, and now is, treating and reducing in said smelting plant large quantities of said ores, to wit, about 7,000 tons of ore per day; and that said ores so treated and smelted contain much copper and quantities of sulphur and arsenic; and that, as a result of the said smelting operations in reducing the said ores, quantities of sulphur and arsenic in various forms are set free from said ores and are carried out through the flues connected with the said large smelter stack, and by the said stack discharged into the atmosphere.

"(10) That the sulphur, in its various forms, so as aforesaid, set free and discharged into the atmosphere from said smelting plant, has caused no damage or injury, since the remodeling of the said smelter, to the complainant, and is now not causing any damage or injury to the complainant in this case.

"(11) That the arsenic in its various forms, so as aforesaid set free and discharged into the atmosphere, from said smelting plant, has been, and is now being, carried by the winds and air currents over, above, and upon an indeterminate portion of the Deer Lodge Valley, adjacent to the said smelter, including the lands and premises owned by the complainant, and hereinbefore described, depositing at times sufficient quantities of said arsenic on the hay, grasses, and fodders growing thereon to injuriously affect and poison many of the live stock which eat of said hay, grasses, and fodder, and feed at large on the pastures and ranges thereof, causing a number of such live stock so poisoned to sicken from the effects of said poison, so that that portion of the Deer Lodge Valley thus affected is rendered thereby less profitable and less valuable for stock raising and grazing purposes, and the hay, grasses, and other fodders grown thereon rendered less wholesome and less valuable for feeding to any animals than otherwise would be, so long as the defendants continue in the operation of said smelter in their reduction and treatment of said ores, as aforesaid, to discharge into the atmosphere such quantities of arsenic as they have been, and are now, so discharging from their said smelting plant.

"(12) That by reason of the defendants operating the said Washoe Smelter since remodeling the same, and so as aforesaid causing to be emitted from the smokestack of said smelter into the atmosphere such quantities of arsenic in its various forms, with the result therefrom as aforesaid, the complainant has suffered special damage and injury in the sum of $350; the same being the actual loss suffered by him in the depreciation of the rental value of said land and premises, so caused by the said defendants, during the period mentioned.

"(13) That the said Washoe Smelter is situate contiguous to an extensive farming and grazing neighborhood lying in said Deer Lodge Valley, which is inhabited by a large number of farmers and ranchmen who own or possess many thousands of acres of improved and unimproved farming and grazing lands, and who reside upon said lands as their homes and keep a large amount of live stock, horses, cattle and sheep, thereon, and follow and pursue farming, dairying, and live stock raising as a means of livelihood. That said farmers and ranchmen constitute a large farming and grazing neighborhood, and the said arsenical fumes so as aforesaid emitted from said smelter more or less affect injuriously all hay, grass, and fodder crops of the said lands, and all of said farmers and ranchmen are, more or less, similarly situated as said complainant, and are, more or less, similarly injuriously affected by the said arsenical fumes emitted from said smelting plant.

"(14) That, if the said defendants continue to operate the said Washoe Smelter 'as heretofore, the said noxious arsenical emanations therefrom will continue to be precipitated and deposited at times upon the hay, grass, and fodder crops grown upon the section of the Deer Lodge Valley heretofore mentioned, including the premises of the complainant, thereby poisoning more or less all such future crops of said lands, and rendering the same more or less noxious and unwholesome food for live stock to the damage of said farmers and ranchmen. That each year and each crop season will bring new causes of action in favor of said farmers and ranchmen and against the said defendants, by reason of loss due to the thereby lessened value of said crops, as forage for animals, and the sickness of live stock consequent upon their grazing upon and eating and ingesting the same, all of which will cause a multiplicity of suits in order to collect damages, which said damages will be difficult of proper computation. That, if said smelter closes operations, the said farms and the farm of complainant, in the course of one year after said poisonous substance should cease to be precipitated thereon, would become free from all noxious effect of said precipitation, as the said arsenical emanations from said Washoe Smelter since September 1, 1903, have in no wise injured or affected the soil of any of said premises or caused any permanent injury thereto.

"(15) That many of the said farmers and ranchmen have settled upon and own the lands, injuriously affected in manner as aforesaid by the said smelter fumes, in the Deer Lodge Valley prior to the year 1870, and have continuously been residents thereon up to and including the present time, and long prior to the conducting of any smelter plant in the said region.

"(16) That there is, and has been at times during the period of operations of the said Washoe Smelter, an abnormal amount of sickness among many of the animals feeding and grazing upon the hay, grasses, vegetation, and pasturage growing upon the said injuriously affected portion of the Deer Lodge Valley, to wit, horses, cattle and sheep; said sickness being due to arsenical poisoning caused by the arsenic in various forms in the fumes emitted from said Washoe Smelter and precipitated and deposited on said growing pasturage.

"(17) That the said defendants or either of them have not paid any damage which the said farmers and ranchmen have sustained, as aforesaid, by reason of the operation of said Washoe Smelting Plant since the remodeling of same and the building of said large stack, and the said defendants have at all times and do now refuse to pay any damage which has resulted from the operation of said Washoe Smelting Plant since July, 1903.

"(18) That, prior to the acquiring by complainant of title to the aforesaid premises owned by him, the same had been farmed by complainant's pred-

ecessors in interest continuously since about the year 1866 or 1867. That the lands making up the said farm of complainant are not first-class farming lands in said valley, but are for the greatest part low, moist, and what is known as cold land, and are best adapted for raising wild and redtop hays, stock raising, and dairy purposes, and are not adapted to the raising of timothy or other cultivated hay or grain crops. And that the surface of said lands is irregular and rough, and a considerable portion thereof could not be irrigated, and crops could not be successfully raised thereon without irrigation. That large portions of said premises contain alkali in sufficient quantities to interfere with the successful growing of crops thereon. That said premises have been neglected and not properly farmed and cared for, and in part allowed to run down and to go to waste, and that a considerable portion thereof was plowed up and left without being seeded, and foxtail and other weeds have been permitted to thrive on the said premises, whereby said premises have become greatly depreciated in value.

"(19) That during and prior to the year 1901 the said premises of complainant were worth not to exceed the sum of $8,000, and since the year 1901, by reason of the neglect and failure to care for the said place, and by reason of the improper farming done thereon, and by reason of the noxious arsenical emanations from said smelter being precipitated upon the hay, grass, and fodder crops grown on said land, the said premises have depreciated in value, and are not now of a value to exceed the sum of $4,000.

"(20) That about the month of March, 1903, and for a long time prior thereto, the complainant in this case had been a resident of the city of Butte, county of Silver Bow, state of Montana, and had been engaged in the butchery and grocery business at said city. That, on account of the ill health of the said complainant, he became desirous of selling all of the property which he owned in the city of Butte, in order that he might remove from the state of Montana, and that, as part of the transaction by which the said complainant disposed of his property in the city of Butte, the complainant accepted the title to said premises in lieu of the sum of $8,000, to be applied upon the general transfer of his said property. That at the time when complainant purchased the said property a contract of sale had been made between the predecessor in interest of said complainant, to wit, one Daniel James, and one John Smith, who was at that time in possession of the premises, and under and by virtue of which said agreement the said John Smith was to purchase the said ranch properly at a stipulated sum. The said complainant Bliss entered into an agreement with the said John Smith, by which the terms and conditions or the contract of sale were changed so that the said Smith was to become the purchaser from the complainant of said property upon the payment to said complainant of the sum of $5,000, and assuming the burden of a certain mortgage which had theretofore been given by the predecessor in interest of the complainant, secured by the said premises, in the sum of $3,000. That, at the time when said complainant purchased and acquired title to the said property as aforesaid, it was the belief of the said complainant that he would be able to sell and dispose of the said property in accordance with the provisions of the contract of sale, which had been entered into with regard to the premises, and that in purchasing the said property the said complainant was moved to do so by his desire to sell his property in the city of Butte. That said complainant did not intend to live, and never has lived, upon the said premises, and that said complainant never did intend to and has not ever attempted to improve or cultivate or farm the same, or to raise any live stock thereon. That, prior to the time when the said complainant purchased and acquired title to the said premises, the said complainant knew that the farmers of the Deer Lodge Valley, including the occupant in possession of the said premises, had made complaints against the defendant companies because of the operation of said Washoe Smelting and Reduction Works.

"(21) That, in the latter part of the year 1904, an association of certain of the farmers and residents of the Deer Lodge Valley, aggregating about 100 in number, was formed for the purpose of procuring evidence and prosecuting claims and suits against the defendants in this action on account of the maintenance and operation of the said Washoe Smelter Plant, and that

one K. D. Smith, the owner of a ranch adjoining the said Bliss ranch. was elected, and acted as, and is still acting as. president of said association. That this action, while brought in the name of the complainant Bliss, was in fact brought by and mainly for the benefit of said Farmers' Association and the members thereof, and that the said Bliss is not, and has not at any time been, a member of said association, and is, so far as is shown by the evidence in this cause, the only person owning farming lands within the smoke affected portion of the Deer Lodge Valley. who was and is a non-resident of the state of Montana. That the said Farmers' Association has selected and presented the evidence in this action, and through assessments levied upon its different members has paid the expenses thereof (which in the preparation and prosecution of this action amounts to a sum in excess of $40,000), and has controlled through a committee, appointed for that purpose, the action, and all steps and proceedings had therein. That the said Bliss, since the commencement of the action, has paid little or no attention thereto, has not procured or caused to be procured any of the evidence presented herein, has not paid or contributed any portion of the expenses of the same, and has not been familiar with and does not know the nature or character of the evidence presented on his behalf in this said suit. That in the year 1905, prior to the bringing of this action, the said complainant placed the control of the said premises in the hands of the said K. D. Smith, president of the said Farmers' Association, for rental purposes, and that the said premises have been controlled and used by the said K. D. Smith, and permitted so to be controlled and used by complainant, in the interest of said Farmers' Association in the prosecution of this action. That in the month of June, 1906, an offer to purchase complainant's premises hereinbefore described was made to him personally, and complainant asked to name a sum for which he would sell and convey the said premises; but the said complainant refused to name a price for his said property or negotiate in any manner for the sale thereof, giving as a reason for so doing the fact that this action was pending.

"(22) That, at the time of the location and erection of said old smelting works, the present site of the city of Anaconda was vacant and unoccupied land and used mainly for the purpose of grazing sheep and cattle. That in consequence of the construction of such works, and the employment of many men in and about the same, a village was founded which grew into the present city of Anaconda, which at the time of the commencement of this action had, and now has, a population of about 12,000. The growth of the city of Anaconda has been gradual, and has been almost entirely caused by the continued conduct of such smelting business. Practically the whole of the population of the city of Anaconda is dependent, directly or indirectly, for subsistence upon the continued operation of the said Washoe Smelter, and more than nine-tenths of the citizens of said city of Anaconda would be compelled to remove therefrom to obtain a livelihood if said smelter should be closed. The city of Anaconda is substantially and permanently built, and many hundreds of thousands of dollars have been expended in the construction of permanent homes by residents of said city, and in the erection of public and business buildings, and that the property owned by the residents and property owners in said city, exclusive of the defendants, in the year 1906, had an assessed valuation of $3,300,000. The said homes were established and the said property investments made because of the presence and operation of the said smelting works at Anaconda and in reliance upon the continued operation thereof. That the city of Anaconda has furnished, since the year 1884, the principal market for the products of the Deer Lodge Valley, the hay, alfalfa, grain, vegetables, garden truck, live stock, dairy, and other products of said farms finding ready market since that time at good prices in said city of Anaconda. That, aside from the city of Anaconda, the only near market for any of the products of the said valley is the city of Butte. Silver Bow county, Mont.

"(23) That all of the construction in said Washoe Smelting Plant is of a permanent character, and consists largely in suitable excavations for the foundations of machinery, furnaces, and other appliances used in and about the smelting plant. That, if a more suitable or adaptable location could be

found for the building of said smelter, it would be necessary to construct thereto a railroad system for the purpose of conveying the ores from the mines at Butte, Mont., to the said smelter, and all of the foundations, masonry, construction, and 45 miles of railroad tracks in and about said smelting plant, amounting to many millions of dollars, would be absolutely worthless and destroyed. That the total salvage from said works which could be rescued from a dismantling of the said works would not amount to more than one-tenth of the total construction cost or value of said works, and would not be of the value of more than $1,000,000. That, in addition to the financial loss which would be sustained, no site could be selected in the state of Montana which would present the same natural advantages for a smelting plant on account of the favorable grade from the mines at Butte to the point of smelting, the topographical features of the country at the works, which permits of the material being handled largely by gravity, and also on the account of the presence of large quantities of coal, water, and lime rock necessary in the economical and profitable operation of such a smelting plant. That, if the defendant companies were obliged to suspend operations in said smelting plant, it would be necessary to select a site at some distant or remote place from the mines which furnish the ore supply for the said smelter, and, on account of the low-grade character of the said ores mined and the increased cost of transportation and handling of such ores, the mining of a very large percentage of the ores now treated at the said smelting plant in the city of Anaconda could not be carried on. That, in the event of the selection of a suitable site for the continuance of said smelting operations, it would require not less than a period of five years, after such site had been selected and transportation facilities had been procured to convey the necessary construction material to such site, to construct such a plant and put the same in operation, and that in the meantime the mines in the city of Butte, which furnished the supply of ore for such reduction works, would have to suspend operations, and would be practically destroyed by reason of such suspension of operation. That the metallurgical processes by which the said ores are being reduced at the said Washoe Smelting Plant is the best process known to science for the obtaining of the valuable contents thereof, and is the only practical process that could be followed in the reduction of such ores; said process cannot be carried on without causing to be released and discharged into the atmosphere certain quantities of sulphur and arsenic; and that no known site exists in the state of Montana where such operation could be carried on with less damage and inconvenience to surrounding property and inhabitants than the present site of said reduction plant; and that, if it became necessary to remove and transport the said ores without the boundaries of the state of Montana, the increased cost of handling the said ores would be such that, because of their low grade character, over 90 per cent. of the same could not be mined or smelted at all.

"(24) That the ores treated at the Washoe Smelter are mainly mined in the vicinity of the city of Butte, and almost wholly from mines owned by the Anaconda Copper Mining Company, the Trenton Mining & Development Company, the Butte & Boston Consolidated Mining Company, the Parrot Silver & Copper Company, the Washoe Copper Company, the Red Metal Mining Company, and the North Butte Mining Company. In addition to the ores mined by these companies, some other ores are smelted for small operators mining at and in the vicinity of said city of Butte.

"(25) That the city of Butte has a population of over 70,000 people, or more than one-fifth of the entire population of the state of Montana, and has grown from a small mining camp with a population of a few hundred people, within the last 30 years; said growth being due almost entirely to the opening up and development of the copper mines of the above-named corporations. That practically the entire population of the city of Butte depends very largely directly or indirectly upon the continued operation of the said mines as their means of livelihood. That, in addition to the many thousands of persons employed in the mines aforesaid, a large number of persons have adopted different branches of industry in the city of Butte, practically all of which said business is dependent to a very large extent upon the continued operation of the said mines. That the said city of Butte is substantially built, and

about $50,000,000 have been spent by the inhabitants of the city in the erection of permanent business buildings, residences. and public buildings in said city. That about two-thirds of all of the ores mined at Butte and vicinity are .treated and reduced at the said Washoe Smelter, and that none of the companies or persons above named and referred to, the ores of which are being treated at said Washoe Plant, has any smelting or reduction plant where the same could be reduced other than at the Washoe Plant, and that, if the said plant should be closed, no means exists by which said ores could be· treated, and the closing of said plant would necessarily cause the cessation of two-thirds of the mining operations carried on at said Butte City and vicinity, with a more than proportionate disastrous effect upon the property owners and inhabitants of said city, of whom by far the greatest number would be obliged to leave the city of Butte, and state of Montana, to find employment in their vocations elsewhere.

"(26) That, in addition to the foregoing, there is used in mining and smelting operations of the defendants ·large quantities of material, such as coal, coke, and lumber, which are supplied from other points than Butte or Anaconda, within the state of Montana, and the supplying of which furnishes employment to a large percentage of the population of the state of Montana, residing in such communities. That the average daily number of men employed directly by the mines shipping their ores to the said reduction works, during the year· 1906, was 4.548 men ; and the average number of men employed in the reduction works at Anaconda during the same time was 2,500 to 2,600. That, in addition to the foregoing, the railroads operating within the state of Montana derive a large proportion of their entire earnings from the freight handled directly in connection with the operations of the defendant companies, and indirectly in handling the freight shipped into and from the cities of Butte and Anaconda. That during the six months of the year 1906 ending June 30, 1906, the amount of money paid in wages to the men employed directly by the defendant companies and the companies shipping ores for treatment to said reduction works was the sum of $5,045,582.57, or at the rate of about $10,000,000 per annum. That the railroad freights paid during the six months of the year 1906 ending June 30th was' the sum of $1,415,890.35, or in an amount equal to approximately $2,800,000 per year, exclusive of all freight paid upon the product of said reduction works. That the amount paid by said companies in carrying on said operations for material, such as coal, coke, and lumber, largely furnished from different points within the state of Montana, and elsewhere, amounts yearly to the sum of $4,000,000. That, in addition to the investment of the defendant companies at Anaconda, the defendant companies have invested in necessary development and equipment of their mining properties in Butte the sum of approximately $50,000,000, which would be entirely lost and destroyed in the event of a cessation of the smelting operations at Anaconda, as would also the values of the ores in reserve which have not as yet been mined, and which amount to an unestimated figure of many millions of dollars.

"(27) The said reduction works since the beginning of operations thereat in the year 1902 alone has expended in labor the sum of $7,007,304.06; for coal, the sum of $4,293,455.87; for coke, $4,012,086.82; for lime rock, $740,047.37; for machinery, $1,316,029.83; for lumber, $53,896.37. That from the time the said smelter began operations up to and including operations for the first six months of 1906 said reduction works has extracted from the ores treated there 590,947,365 pounds of copper, 25,898,554 ounces of silver, and 164,806 ounces of gold. That the copper produced at· said smelter is used principally in the manufacture of electrical appliances and machinery and in the manufacture of brass, bronze, and other metals; and the said supply from said smelter has constituted during the various years which said smelter has been operated from 8.2 to 11.5 per cent. of the entire world's supply of copper, and from 17 per cent. to more than 20 per cent. of the entire supply of copper of the United States. That at the present time the demand for copper for use in manufacturing, industrial, and commercial pursuits is extremely great, and there are not now any known sources of copper in the world from which the deficit which would be caused by a suspension of the smelting plant at Anaconda could be supplied, as a result of which widespread distress and

inconvenience would follow the cutting off of the supply of copper from such works, in addition to the general injury and damage which would be done the state of Montana in particular.

"(28) That the city of Anaconda is the county seat of the county of Deer Lodge, and the total assessed value of the real and personal property of the said county of Deer Lodge in the year 1904 was $8,120,826. That of such amount the sum of $4,058,573 was assessed against the property of the Washoe Copper Company and the Anaconda Copper Mining Company, defendants, within said county. That during the years from 1902 to 1906 the defendants in this action have paid upon their property in Deer Lodge county from 51.6 per cent. to 57.4 per cent. during each year of the total amount collected in taxes by said county of Deer Lodge in the respective years. That an injunction against the operation of the said smelting works as prayed for in the complaint herein would render all of said property so assessed, of the Anaconda Copper Mining Company and Washoe Copper Company, practically valueless, and would cause such a depreciation in other property now subject to assessment, with a corresponding reduction in the revenues of said county, that it would be impracticable and impossible to continue the county organization and county government of the county of Deer Lodge with such sums as might be raised by assessments upon property therein, and would result in an abandonment and disorganization of the county government. That the city of Butte is the county seat of the county of Silver Bow. That, of the total taxes collected by the county of Silver Bow for the year 1906, about 30 per cent. thereof was collected from the assessments levied upon the mines and net proceeds of mines, the ores of which are treated at the said Washoe Smelter, and which would be closed down by the closing of said smelter, and that the closing of said smelter would render practically all of said property valueless, and would cause such a depreciation of other property in Silver Bow county now subject to assessment that it might be impracticable and impossible to continue the county organization of the county of Silver Bow with such revenues as said county would be able to obtain, and might cause the disorganization and abandonment of said county government. That the county of Deer Lodge, since 1902, has paid about 6 per cent. of the total taxes collected by the state of Montana for state purposes, and the county of Silver Bow, during said period, about 25 per cent. of the total taxes collected by the state of Montana for state purposes, and that, if the injunction were granted as prayed for in the complaint herein, there would be such a depreciation in the amount of assessable property in said counties subject to assessment for state purposes as to materially impair the revenues of the state of Montana.

"(29) The closing down of the said smelting works at Anaconda would, by the destruction of its principal market, the city of Anaconda, work destruction and irreparable injury to the complainant, and to others owning property within the said Deer Lodge Valley and vicinity, which injury would result directly in the loss of the market for such products of such lands, and that the said lands would be very seriously depreciated in value by such closing, and that the damages which would be so sustained by the complainant and the other owners of such land would, with respect to the closing, be greatly in excess of the damage they would sustain by reason of the continuance of the said smelter as the same is now operated, and that the closing down of the Butte mines, which would be closed by the cessation of operations in said Washoe Smelter, would cause an irreparable injury to the farms of the Deer Lodge Valley by loss of their only remaining near market, and cause a consequent further reduction in the value of said lands.

"(30) That it was stipulated by the parties complainant and defendants, during the presentation of defendants' evidence, and it is therefore found as a fact, that the defendants in this cause are each of them solvent and able to pay and respond for all damages which have been or may be sustained to property from the operation of the said Washoe Smelter.

"(31) That the value of the matter in dispute in this suit exceeds the sum of $2,000 exclusive of interest and costs."

Most of the findings of the master were approved by the court; they being departed from only to some extent in a few instances, as will be seen from the following excerpt from the opinion of the trial judge:

"The most important of the master's findings are: That the sulphur in the smoke from the smelter stack has caused no damage or injury to the crops on complainant's land since the remodeling of the Washoe Smelter in 1903; but that arsenic was deposited at times upon complainant's farm in a way to injure the fodders grown thereon; that live stock was poisoned from the effects thereof, and that a portion of the Deer Lodge Valley was less valuable for stock raising and grazing purposes than it otherwise would be, by reason of the operation of the smelter; that the complainant, Bliss, has suffered special damage in the sum of $350, in the depreciation of the rental value of his land; that the farmers in the Deer Lodge Valley constitute a neighborhood: that arsenical fumes emitted by the smelter more or less injuriously affect all hay, grass, and fodder in the neighborhood; that, if the smelter continues as now operated, the future crops will be more or less poisoned, and the live stock will be sickened; but that, if the smelter should close, the effect of the poisonous matter would cease; that there has been no injury to the soil of any permanent character; that in 1901 complainant's land was worth not to exceed $8,000, and at the time of the suit it was worth not to exceed $4,000, because of the improper farming done, and because of the injury from the arsenical emanations from the smelter. He finds that in 1904 the farmers of Deer Lodge Valley formed themselves into an association to procure evidence and prosecute claims and suits against the defendants on account of the maintenance and operation of the smelter; that this suit was brought mainly for the benefit of the Farmers' Association; that Bliss himself was not a member thereof; and that the control of this action has been exercised by Smith, president of the Farmers' Association, in the interest of the association. The findings set forth that the present processes used at the Washoe Smelter are the only practical ones that can be followed in the reduction of the ores treated; that there is no site in Montana that could be selected where operations could be carried on with less damage and inconvenience; that the mines in Butte have their ores smelted principally at the Washoe Smelter; that, if the smelter were to close, two-thirds of the mining operations in Butte would stop; that irreparable injury would be done to the complainant and others owning land in Deer Lodge Valley, because of the loss of markets for the products of their lands; that the value of their lands would be depreciated; and that the damage which would accrue to them would be greatly in excess of the damage they would sustain by reason of the continuance of the smelter as it is now operated.

"Thereafter counsel for complainant and for defendants, respectively, filed exceptions and objections to the findings and report of the master. The exceptions amounted, in substance, to this: That some of the findings of fact were against the weight of evidence; that some were not supported by the evidence; that the findings were defective in not covering certain issues; and that some were upon immaterial and irrelevant issues.

"The case, having been referred to the master without the consent of the parties, is conceded to be one where the findings reported are merely advisory, and where the court may adopt the information communicated by the master's findings upon the evidence and may accept the same or disregard it, in whole or in part, according to its judgment, as to the weight of evidence. Such is the rule as declared by the Supreme Court in Kimberly v. Arms, 129 U. S. 512, 9 Sup. Ct. 355, 32 L. Ed. 764, and as recognized by this court when it denied this complainant's motion for an order to require the master to file his findings of fact without setting a time to receive exceptions to his report. Bliss v. Anaconda Copper Mining Co. et al. (C. C.) 156 Fed. 309.

"Having accepted the view, therefore, that the case is for final decision upon the pleadings and proofs, counsel for the respective parties in their elaborate and able arguments have addressed themselves to the whole record, referring, however, to many of the findings of the master as correct and acceptable to both sides, yet alluding to others as foundation aids only upon the issues involved, not casting the burden upon either of the parties in their exceptions, and not, like the findings of an independent tribunal, to be taken as presumptively correct, only to be disturbed where clearly in conflict with the weight of the evidence upon which they were made.

"These considerations are the law applicable to the method of approaching the investigation of the record. The learned master himself took this view of the effect of the reference; and it is just to him to say that his work has been of such a helpful character that counsel, throughout their arguments, have recognized the vast amount of painstaking study which he has evidently given to the testimony, and have accorded to his findings the most respectful attention.

"Two hundred and thirty-seven witnesses testified. The evidence covered a very wide scope, reaching out, not only to the substantive question whether the single complainant, Bliss, has suffered special injury because of the smelter fumes blowing over his land, but whether, as a truth, because of the fumes blowing over the farms of others, injury has been done, and the Washoe Smelter is a public nuisance, as defined by the law.

"Farmers and stock raisers from within the neighborhood of the Deer Lodge Valley gave evidence as to what they observed or knew, and scientists of the widest experience advanced their views in the general and technical diseases of live stock, and in agriculture, chemistry in its various technical branches, toxicology, pathology, pathological histology, anatomy, botany, bacteriology, zoölogy, mineralogy, metallurgy, and in forestry.

"Exhaustive examinations of each technical expert followed careful special study and preparation in the particular subject testified to, and nearly every assertion claimed to rest upon scientific learning and research was challenged by cross-examination and disputed by experts produced upon the opposite side. Under the circumstances, we can well understand that jealous regard which many of them observed for nicety of distinction, and why, too, a number of them were exceedingly cautious in declining to give opinions which called for expert knowledge one whit outside the technique of their respective specialties. Among the expert witnesses who testified may be mentioned: Prof. Joseph Blankenship, of the Agricultural College of Montana; Prof. Charles A. Doremus, of New York; Prof. M. J. Elrod, of the University of Montana; Dr. Robert J. Formad, of the United States Bureau of Animal Industry; Prof. W. D. Harkins, of the University of Montana; Dr. M. E. Knowles, State Veterinarian of Montana; Dr. Duncan McNab McEachran, of the Canadian government veterinarian service: Dr. V. A. Moore, of Cornell University; Dr. Leonard Pearson, of the University of Pennsylvania and State Veterinarian of Pennsylvania; Dr. D. E. Salmon, formerly head of United States Bureau of Animal Industry; Dr. Harry Snyder, of the University of Minnesota; Dr. Ralph E. Smith, of the University of California; Dr. Theobald Smith, of Harvard University; Dr. R. E. Swain, of Leland Stanford, Jr., University; and Prof. F. W. Traphagen, of the Colorado School of Mines.

"Exhibits, more than 800 in number, accompany the record. There are numerous specimens of bones, animal tissue, consisting, in part, of stomachs, noses, sections of arteries, livers, kidneys, etc.; flue dust; or normal and abnormal plant life of the Deer Lodge Valley; and of portions of trees and shrubs; while hundreds of photographs were used to illustrate varieties of conditions relevant to the issues.

"To enter upon a detailed statement of the testimony, which alone covers over 25,000 pages, would be to extend this opinion far beyond what is necessary. It would require copious extracts from the direct and cross examinations of many witnesses. Conflicts of reason would have to be set forth, apparent and real inconsistencies would have to be pointed out at length, and the train of reasoning which formed the bases for the seriously conflicting conclusions, and sometimes irreconcilable difference of opinion among scientific witnesses, could only be well and fairly set forth by lengthy and exact quotations from the elaborate, technical explanations. Therefore, to reduce the facts directly to as brief a statement as the record reasonably justifies, I have thought it proper to adopt the substance of those findings of the master which have not been excepted to, and in a narrative way of my own simply to state the case and to comment thereon as the weight of evidence warrants.

"The Deer Lodge Valley in Montana, where complainant's lands are situated, lies north and west from Butte, and northerly and easterly from Ana-

conda. The valley is high (over 5,000 feet in altitude), between two ranges of the Rocky Mountains. It is generally regarded as extending from the Northern Pacific Railroad, near Garrison, southerly toward Butte for a distance of about 40 miles. Its average width is about 10 miles. The mountains about the valley have been extensively exploited by prospectors and miners. Settlements were made as far back as 1864, and during the years thereafter ranches were taken up by stockmen and farmers, so that now the valley is quite well settled; many farmers owning lands and homes therein. In the earlier days stock raising was the principal occupation of the ranchmen, but from 1880 on, as settlement increased, the ranges became poorer, fences became more common, larger herds of range stock were driven out to more open ranges, and, in a great measure, since about 1881, diversified farming has superseded stock raising. The valley is quite well watered, and is generally adapted to dairying and stock farming, and to the growing of hay, grain, alfalfa, and such garden produce as grows in the mountain valleys of this latitude. The city of Anaconda is in the southwesterly part of the valley upon Warm Springs creek, a mountain stream, that flows into the Deer Lodge river. The Washoe Smelter, which is said to be the cause of injury to complainant and others, stands on a slope of the mountains west of the valley, a mile and a half southeast of the city of Anaconda.

"In 1883 and 1884, a corporation styled the Anaconda Mining Company, not a defendant, operated a smelter near to the site of the Washoe Smelter. The Anaconda Mining Company owned valuable properties in the vicinity of Butte, about 30 miles distant from Anaconda, and was working and developing mining claims, which produced large quantities of low-grade ores, only capable of successful treatment by reduction works. These ores were in large part of such a character that in order to reduce the same, and extract the metal contents thereof, it was necessary to concentrate the same by the use of large quantities of water. It being deemed necessary for the Anaconda Mining Company to construct reduction works, extensive investigations were made by its agents for the purpose of fixing points where sufficient water could be obtained, and other natural facilities afforded for the operation of such proposed works, and a place near where the city of Anaconda now stands was chosen as the best site.

"The Anaconda Mining Company, without objection on the part of any one, proceeded to construct its smelting works, and expended in connection therewith several millions of dollars. In 1884, when the works were completed, the company began to treat, and did treat, down to the year 1895, thousands of tons of ore per day. The works of the said company were located upon the north bank of Warm Springs creek, at a point one mile in a northerly direction from the present Washoe Smelter, and are spoken of throughout the testimony of the witnesses as the 'Old Works,' in contradistinction to the Washoe Smelter. Between 1884 and 1895, the Anaconda Mining Company operated the works, but in 1895 transfer of the property was made by the Anaconda Mining Company to the Anaconda Copper Mining Company, a defendant herein.

"Thereafter it was determined by the defendants to construct a new smelting plant upon more modern and economical lines than the old works had been constructed upon, for the purpose of reducing the ores mined by the defendant companies and other mining companies at Butte. Investigation was had, and the present site of the Washoe Smelter was chosen as being the most available and suitable within Montana, and the Washoe Smelter was constructed by the Washoe Copper Company, defendant, for the purpose of taking the place of the old works, heretofore referred to. The Anaconda Copper Mining Company transferred its smelting operations to the Washoe Smelter, and thereafter demolished the old works, and at the time of the hearing of the testimony in this suit had no other available means of smelting or reducing the ores then being treated and smelted by it than the Washoe Smelter. Several years were consumed in erecting the Washoe Smelter, and about $9,500,000 expended in its construction. The ores treated and smelted at Anaconda since 1884 are sulphide copper ores, containing large quantities of sulphur and arsenic, quantities of which substances, in various forms during the processes of smelting, have been and are being released and dis-

charged into the atmosphere, and disseminated by the changing air currents over various and indeterminate areas of territory. About 7,000 tons of such ores are being treated each day at the Washoe Smelter.

"Between February and September, 1903, the defendants remodeled the Washoe Smelting Plant. Before the remodeling, the sulphur and arsenic fumes had been carried out into the atmosphere by means of four chimneys, each of which was about 225 feet in height, and constructed on a level approximately with the smelting plant; but, in the remodeled construction, defendants built a large brick stack, and connected the same by means of flues with the smelting plant. Prior to 1902 there never was any complaint by farmers or property owners that there was any damage being done by the smelter fumes.

"Between February, 1902, and February, 1903, when the construction of the new flues and stack was commenced, many of the farmers of the Deer Lodge Valley complained that such quantities of sulphur and arsenic were discharged into the air through the several smokestacks, with which the smelting plant was then being operated, that the crops and live stock in the valley were being poisoned and injuriously affected, to the great damage of the owners. Claims for damages on account of such poisoning, aggregating several hundreds of thousands of dollars, were presented by the farmers to the defendant Anaconda Copper Mining Company. The company's representatives investigated the matter, and reported that damage was being done to the farmers, whereupon the defendant Anaconda Copper Mining Company made settlements and paid out to different persons sums amounting in all to more than $330,000. The company, intending, as far as possible, to prevent any further damage, and any further claims for damage, had investigations made to determine methods and means by which the noxious substances emanating from the ores in smelting could be caught and retained from the gases and smoke, and that the remainder might be so scattered and disseminated as to cause no damage, if possible. As a result of such investigations, it was determined that the best way to accomplish the purpose was to construct large flues with dust chambers to collect the solid particles, so far as possible, from the smoke, and to erect a high stack upon an elevation at some distance from the smelting plant, in order that the fumes escaping into the atmosphere might be discharged at as high an elevation as possible, and thus become widely disseminated and diluted before coming in contact with any of the soil in the valley.

"In order to carry out the results reached through the investigations, the use of the old smokestacks at the smelting plant was discontinued, and the defendant companies began to build a large stack, and to construct enormous flues to connect the stack with the various portions of the smelting plant wherein gases and other emanations were created in the operation of reducing the ores treated. In the execution of the plans, an elevated point was chosen as the site for the chimney, and a new chimney was put up, 300 feet above base, and at an elevation of about 1,100 feet above the Deer Lodge Valley proper. The diameter of the chimney at its base is 31 feet and 6 inches, and its diameter at the top 30 feet inside. The chimney is connected with the smelting plant proper by a double system of flues running from the base toward the smelting plant for a distance of about 1,000 feet. These double flues are connected with the chimney at opposite sides, at the base of the stack, and are constructed partly by excavating cuts in the hill, lining the same with brick, and by arched overhead construction, and are 60 feet in width and about 35 feet in height. At the end of the 1,000 feet of construction of double flues, and connected therewith, is a single flue, which is 60 feet in width and 35 feet in height. The single flue is about 1,300 feet long, and at the end farthest from the stack is connected with separate flues and dust chambers, running to what are known as the reverberatory, the roaster building, the blast furnaces, and the converter plant, respectively; these being the several plants in which all the gases and emanations from the smelting operations are produced. Under the main flue and the double flues, tunnels have been excavated, through which cars run, and the flue dust catching capacity of these large flues remains practically unimpaired.

"The respective plants in which the gases and fumes are generated are

connected with this large flue by dust chambers and separate flues, which are of the following dimensions: A blast furnace chamber 250 feet long by 40 feet in height, by 40 feet in width; a roaster dust chamber 290 feet long, 40 feet in height, by 40 feet in width; a converter dust chamber 260 feet long by 40 feet in height and 40 feet in width; a reverberatory dust chamber of the same dimensions as the blast furnace flue. All of the smoke and gases and other emanations from the smelting plant pass through these various dust chambers and flues up to the main stack, and go to the top of the stack, and thence into the atmosphere.

"There is a dust catcher at the rear of the blast furnace building, the Mc-Dougall building, and the converter building, its purpose being to remove the dust from the smoke, the dust being removed for its valuable metal contents, and to prevent its going out to do damage to land.

"The company also constructed an arsenic plant adjacent to the large flue, containing three furnaces, with a capacity of about 10 tons each, for treating arsenic, for the purpose of separating the arsenic which collects and settles in the main part of the flue from a portion of the flue dust before the flue dust is returned for treatment to the smelting plant.

"Arsenic is a by-product of the ores treated for commercial purposes. The portion of the dust which is high, about 90 per cent. in arsenic, goes to the arsenic plant, and as much as 2 tons a day is collected and sold for commercial purposes. The portion of the dust not treated for arsenic, approximately 160 tons daily, goes directly back to the reverberatory smelting furnaces in the form of flue dust and is treated for the extraction of copper, silver, and gold. Some of the arsenic found in the ores treated in the blast furnaces and roasters goes out in slag, and part in volatile substances that is left in the smoke goes up the chimney and out into the air.

"The only possible conclusion from the evidence is that, as a result of these briefly described improvements, the defendants built their plant in accordance with the best-known methods and processes ·for accomplishing the purposes intended, and that the endeavor of the defendants has been, through these methods, to render the smoke, fumes, and emanations from the smelter harmless. Furthermore, as the case is submitted, the evidence discloses that the steps taken by the defendants are far greater and more extensive in character than those taken by any other copper smelter, and that the effect of the remodeling of the plant and the use of the flues, dust chambers, and stack described has been to prevent and to discontinue, proportionally to the ore treated, the discharge into the atmosphere of much of the dust containing the noxious substances complained of, which, before the improvements, had been discharged into the air from the smokestacks of the plant; and that a resulting effect has been that the fumes and whatever dust the same contains, which was not removed therefrom, have been disseminated and scattered by air currents at a great height over a large area of country, thus rendering less harmful in proportion to the ores treated the smoke, fumes, and emanations from the plant than was the case before the improvements were made.

"Profs. Swain and Harkins, expert chemists, made some experiments by Pitot tubes, introduced for 10 hours into the big stack 50 feet above the base, to ascertain the volume of smoke thrown out from the stack every 24 hours, and the milligrams of arsenious oxide contained in one cubic foot of the smoke. But Prof. Swain stated, in substance, that it was impossible to carry out the experiments as attempted by him, without introducing some errors, and that the slightest mistake in the chemical analyses in trying to arrive at the amount of arsenic would be multiplied by millions and millions. So much depended, too, in the experiments, not only upon accuracy in obtaining velocity and the ratio of volume of the sample taken to the total volume going out of the stack, but also upon the character of ore treated and upon the temperature and other conditions at the very time of the experiments, that the court is not warranted in saying what was the exact volume of gas, and what its correct analysis is; and, as the case develops, it does not become of great importance.

"At this point we may well turn to the evidence concerning complainant's relation to the case. He owns 320 acres of land about five miles east-

erly from the Washoe Smelter. Before he acquired his farm it had been occupied and cultivated by his predecessors in interest since about the year 1866 or 1867. The lands of complainant's farm are not of the best class of lands in the Deer Lodge Valley. They are known as cold lands; are in part low, and moist and partly contain alkali; are best fitted for raising wild and redtop hays, for stock grazing and for dairy purposes; and are not very well adapted for crops of timothy or other cultivated hay or grain. Moreover, the complainant has not taken good care of his premises, but has permitted them to run down, and has allowed a part of the land to remain without seeding, so that foxtail and other weeds have been allowed to grow, to the substantial depreciation of the value of the land.

"Mr. Bliss acquired his farm in this way: About March, 1903, while he was in business in Butte, his health was not good, and he desired to leave the state of Montana. In making business arrangements looking to that end, he accepted title to the farm in Deer Lodge county, in lieu of the sum of $8,000 to be applied upon the general transfer of his property. When he bought the farm, a contract of sale had been made between his predecessor in interest and the complainant, a man named Daniel James and one John Smith, who was at that time in possession of the farm, and who had used it for pasture purposes, under and by virtue of which said contract the said Smith was to purchase the ranch at a stipulated sum. The complainant, Bliss, entered into an agreement with Smith, by which the terms and conditions of the contract of sale were changed, so that Smith, instead of becoming a purchaser from James, was to become a purchaser from complainant, upon payment to the complainant of $5,000, and assuming the burden of a certain mortgage which had theretofore been given by the predecessor in interest of the complainant, secured by the said premises, in the sum of $3,000. It was in this way that the valuation of $8,000 was put upon complainant's farm. The valuation, however, was a fair one in 1903, though since then the value has fallen to about $4,280. The investment in the farm was made by complainant under the belief that he would be able to sell it in accordance with the provisions of the contract of sale which had been entered into with respect to the property. It was not Mr. Bliss' intention to live upon the place. He never has lived upon it, and never has attempted to improve or cultivate or farm it, or to raise any live stock upon it. Moreover, he knew when he bought that the farmers in the Deer Lodge Valley, including the occupant in possession of the farm, had made complaint against the defendant companies, on account of the Washoe Smelting and Reduction Works.

"Reverting to the value of the Bliss land: Inasmuch as complainant, in 1904, rented the ranch to K. D. Smith for $750, and the making of some improvements worth about $200, the rental value of that year was practically 12 per cent. of the then value of the land. Estimating 12 per cent. of the value as a fair rental, if it had not been damaged through any cause, complainant ought to have received $950 rental in 1905; whereas, the best offer he had in that year was $500 a year for a two or three year lease. This offer represented 12 per cent. of approximately $4,200, which sum is therefore a just estimate of the value of the place in 1905 and 1906 and 1907. From these figures it is shown that the depreciation in value of the land was $3,800, and in rental value $450 per annum, or a total of $900 for 1905 and 1906.

"It is very hard to reach a satisfactory conclusion as to the principal special causes for the depreciation in value of complainant's land. Farmers who have known the land for 30 years differ radically; some ascribing the deterioration to poison of fodders by smelter fumes, and consequent danger to live stock and to crops, while others say that the value is reduced because in 1902, 1903, and 1904 the natural hay meadow was plowed and never seeded thereafter; that the land has been neglected, has much alkali, is injured by sunflowers, foxtail, and other weeds; and that there has been no injury at all to the pasture or to animal life thereon by the smelter smoke. The experts also disagree in most positive terms as to the condition of the fodder and the soil. But, after considering the evidence concerning some of the live stock that fed upon the pastures of the ranches in the immediate

vicinity of the Bliss place, together with that bearing upon the condition of some of the animals that were upon the pasture in the Bliss ranch itself, my opinion concurs with the master's in finding that both of the causes ascribed—lack of proper farming and smelter fumes—existed and contributed more or less to the lessened value.

"The fact is deducible, though, that the lesser injury was done by the smelter, and for these reasons: As heretofore stated, when Mr. Bliss bought his land, its principal value was for dairying purposes. It is entirely certain, too, that thereafter, in 1905, while he owned the place, the offer to rent that he received was made by a man who wanted it for a dairy. Now if it were true that the cattle and horses of the dairymen who might rent would be exposed to poison in eating the grass in the pastures, and to the consequent sickness, falling off of milk production, loss of calves, and other effects of ingesting grass or hay that has been poisoned with arsenic, we naturally inquire why it was that Boone, who knew all the conditions that existed about the place in 1904, and whose good faith in offering to rent from Mr. Bliss was beyond question, wanted to rent the farm for dairying purposes and was willing to pay $500 a year rental for several years. The answer would seem to be a simple one, in the light of ordinary human experience. Common knowledge tells us that the last place a dairyman would seek would be a farm where cattle would be exposed daily to the peril of poison from arsenic in the pasture where they would feed; while, on the other hand, there would be nothing unusual in his taking a farm adapted for pasture and dairy purposes if the only objection was that it had been badly cultivated, or was unsuited for general agriculture. Thus we are irresistibly forced to the conviction that as a fact, viewed from the standpoint of an experienced dairyman, the injury to Mr. Bliss' pasture from arsenic was not of the most serious character; and hence it follows that the larger depreciation must be attributed to some cause other than injury from poisoned fodders.

"And in support of this there is further evidence of telling force: A dairyman named Sweeney, of years of experience in Minnesota and Montana, who also knew the Bliss ranch well, rented part of it, in 1905, from Mr. K. D. Smith, president of the Farmers' Association, and agent of Mr. Bliss. The dairyman testified that he had 68 head of cattle on the Bliss ranch; that they did well; that every milk cow had a calf; that the calves were the 'finest' he had had since he had lived in the valley; that his 60 milk cows gave a general average of 2½ gallons of milk a day, per cow; that the cattle ran in the pasture; that he had lived near the Bliss place since 1903, when the new stack was operated, and had not been injured in any way by smoke; and that he had made money in his business until March, 1906, when he had sold his cattle at $40 a head to another dairyman named Verlaine, who lived upon an adjoining ranch.

"But, furthermore, Wolfe, a dairyman who was called by the complainant, and who had rented the northern part of the Bliss ranch from Smith, agent, in 1906, admitted that his 24 cows on the Bliss place gave an average quantity of 2½ gallons of milk a day for each cow. He said that he took them up to the stables in the fall, and that he fed them meal and some alfalfa which was raised upon a ranch only a mile away from the Bliss ranch, and that he had lost one calf, which was sick when he went to the place, and one after he went there, and that two of his cows aborted after he went there. It is in evidence that the calf that died after he was on the place had white scours caused by feeding upon sour milk. Still further: Another dairyman named Blaine, who, like the others, concerning whom mention has been made, was familiar with the conditions and locality, and he went to the Bliss ranch in June, 1906; that Wolfe's cattle looked well; that Wolfe wanted $60 a head for them; that he (Blaine) agreed to buy the cattle from Wolfe at $55 per head, and tried to rent the Bliss place for dairying; but that Mr. Smith, president of the Farmers' Association, ordered him off the ranch and prevented the consummation of his plans.

"In the light of this evidence, how can the court find that there was very serious injury done to the fodders on the place by arsenic? Much less, too, can a conclusion be reached apportioning the damages.

"No summary of the facts would be complete without reference to the attitude of many of the farmers of Deer Lodge county. Some time during the latter part of 1904, about 100 (approximately one-half) of the farmers and residents of that part of the Deer Lodge Valley, called by complainant the 'Smoke Zone,' adjacent to the city of Anaconda, representing an ownership of over 50,000 acres of land, formed an association for the purpose of procuring evidence and prosecuting claims and suits against the defendants in this action, on account of the maintenance and operation of the Washoe Smelter. Mr. K. D. Smith, who owned the ranch adjoining complainant's place, was elected president, and ever since 1904 has acted as the head of said association. Bliss, this complainant. is not and never has been a member of the said Farmers' Association. and appears to be the only nonresident owning farming lands in the so-called 'Smoke Zone.' Although he is the sole complainant herein, the suit has been prosecuted mainly for the benefit of the members of the Farmers' Association. It appears that, before the present suit was instituted, the farmers. seeking settlement for damage claims, wrote to the representatives of the defendant Anaconda Copper Mining Company. The company, through its agent, replied, asking the Farmers' Association to specify by bill of particulars the damages claimed by each and every farmer who felt that his property had been injured by the smelter fumes. To this letter the Farmers' Association replied at length, demanding cash purchase of their lands before May 1, 1905, in the following language (italics mine):

"'Anaconda, Montana, March 4, 1905.

"'Anaconda Copper Mining Company, Anaconda, Montana—Gentlemen: The Deer Lodge Valley Farmers' Association, consisting of 107 members, representing over ninety per cent. of the lands and property of the Deer Lodge Valley, comprising practically all of Deer Lodge county and the southerly portion of Powell county, did on February 21, 1905, call a meeting of said association to be held at the Willow Glen schoolhouse in Deer Lodge county, at which nearly all the members of the said association were present. The undersigned committee, consisting of nine members, were duly elected by said meeting for the purpose of receiving all claims for damages resulting from the operation of your smelting plant, known as the Washoe Smelter.

"'*At said meeting it was understood by all the members of said association that they would present their claims for the lowest cash settlement which they would be willing to consider by way of compromise for all of said damages and that said committee should* be empowered to exclude any unjust claim or claims for damages, as well as reduce the amount of any claims which would be considered too high after an investigation by said committee. * * *

"'The claims which the committee approved are presented for settlement after a very careful investigation, and, as the committee was selected from all portions of the valley, the committee were in a position to pass on most of these claims from personal knowledge of the property of the claimants. In fixing the damage, if any part or portion appeared unjust or was in doubt, the committee eliminated that part or portion of such claim. *It would therefore follow that the committee would not care to consider any counter proposition from your company on approved claims.*

"'As to the claims which are presented without recommendation, if your company does not see its way clear to adjust them on the basis on which they are presented, you are at liberty to enter into personal negotiations with these claimants. These personal negotiations, however, and the delay arising therefrom, shall not in any manner interfere with the association from filing suits in equity and bringing actions at law for damages, it being the sense of the association, as expressed through the committee, that unless an early settlement can be reached, that suits in equity will be filed and actions at law commenced, which would not prevent a settlement unless the company should consider such action on the part of the farmers to be a withdrawal of the offer of compromise. No suits of any character will be filed before the 7th day of April, 1905, but from that date it will be optional with the *members of the association to institute legal proceedings unless the*

186 F.—52

818          186 FEDERAL REPORTER

*company has signified, through its proper officers, acceptance of the settle-ments proposed.*

" 'Claims have been presented for damages aggregating $2,300,000.00 as the damages actually sustained by members of this association. *These claims have been reduced to about $1,750,000.00 and for this amount the committee has instructed suit to be brought in the individual names of the parties, unless a settlement is reached.*

" 'The cause of this reduction has been owing to the fact that the company settled with most of the farmers two years ago for personal damages; that claims for damages to crops and personal property have been eliminated except for the past two years, excepting in three instances, which are N. J. Bielenberg, Quinlan Bros., and August De Rosier. These claims have been included for a greater period than two years for the reason that no settlement was reached between these parties and the companies two years ago. The farmers, however, contend, after having been advised by counsel, that five years is the statutory period in which actions for damages of this character can be maintained. Whether or not the company will accept this contention will be immaterial, for the reason that all claims except the three mentioned have been restricted to the two year period.

" 'All unjust, inequitable and slight claims for damages have been rejected. This also accounts for the difference between $2,300,000.00 and $1,750,000.00.

" '*When the farmers were called upon to place the lowest cash valuation of the damages which they had sustained, they presented to your committee damages aggregating $1,536,876.00. Your committee after careful and thorough investigation reduced these claims to $1,120,731.00 approved claims, and $127,979.50 claims to be submitted without recommendation. It is understood and agreed that if the company makes settlement of these claims as presented, this includes title to all of this property, including land, water rights and improvements, and that the farmers will surrender possession of these properties not later than November 1, 1905, provided settlements are made and money paid on or before May 1, 1905.*

" 'The real property damage included in this settlement consists of 60,525 acres of patented lands, together with all water rights and improvements, all being under fence, and generally all improved farms, for which is demanded the sum of $918,147.00, which insures the company title to all of these lands, water rights and improvements for the sum of 17 cents per acre. The committee also suggests that if a settlement can be reached, that the company shall be allowed in every instance to withhold whatever amount of money may be necessary to perfect title or remove liens or incumbrances. *That in a few instances, some of the farmers have indicated that if the company would deed back the land and improvements, they would be willing to allow a certain stated amount by way of reduction in the amount presented, if allowed to keep the property.*

" 'Almost all of the claims for personal property damaged were rejected, as nearly all the stock were settled for two years ago, and the committee refused to allow any damages except on new stock which has been brought into the Deer Lodge Valley since the settlement. In place of any new stock having been brought in, nearly all of the stock has been removed from the valley, owing to the general sickness and death of the stock.

" '*The committee also desires that no settlement be made with the individual members of the association, and that in the event of a settlement* that the same be made through the Daly Bank & Trust Company, of Anaconda, Montana, through the committee of farmers, as certain advances, attorney fees and expenses had been incurred which it would be impracticable to collect if individual settlements were made in the absence of any member or members of the committee. * * *

" 'The farmers are anxious to have an early disposition of the matter on the part of the company, as they will attempt to protect the coming crop provided settlements cannot be made.

" 'The committee by way of explanation, desires to call the attention of the company to the fact that the farmers have not presented their claims for damages since the settlement two years ago up to the present time, for the reason that when said settlement was made, the company promised and

the farmers believed that the construction of a large stack would prevent further injury and the farmers decided to wait until they became fully satisfied as to what would be the result of the operation of the smelter after the construction of a large stack. It has now become apparent to the farmers of Deer Lodge Valley that stock raising and farming cannot exist there so long as the smelter is being operated on its present large extensive scale, and treating the class and character of ores which are produced by the mines of Butte. The farmers also feel that, having settled in the valley long prior to the smelting plant, they have prior rights which the smelting interests are bound to respect, and which should be taken into careful consideration by your company in attempting to reach an amicable settlement.

" 'The members of the association and the committee have kept constantly in view the fact that the company, in operating its smelter, has at all times used the latest and most improved methods for smelting, and that the damages which have arisen have been the natural and usual result of the smelting operations. That the company two years ago made prompt settlement of the damages which had been occasioned by the operation of the smelter; that the company immediately thereafter spent a large sum of money in good faith in attempting to avoid further damages to the farmers of Deer Lodge Valley. The farmers have at all times been anxious to remain on good terms with the smelting interests, fully realizing the importance of the mining industry to the state of Montana, and that mining cannot be conducted without smelting and the conducting of smelting plants, and that there is not a single farmer who is a member of this association who is desirous of in any manner interfering with the operations by the company of its mining properties or its smelting plant, until it becomes apparent that the company intends to continue its smelting operations without regard to the total destruction of the stock raising and farming interests of the Deer Lodge Valley.

" 'Acting in view of these important considerations, the committee has felt that the farmers should stand at least one-third of the entire loss accruing to them by reason of the operation of your smelting plant, in order that an amicable settlement between the farming interests and the smelting interests may be reached. It has therefore been the effort of the committee in adjusting these claims to present them at approximately two-thirds of the damages sustained, and not to approve a claim where the individuals would not submit to the one-third reduction.'

"This letter was signed by nine persons, as members of a committee of the Farmers' Association.

"The defendants appear to have made no reply at all to this demand, and this suit was instituted on May 4, 1905. It does not appear that any action at law has ever been filed by complainant, or that any judgments for damages have been obtained by any members of the Farmers' Association, though two or three suits are pending for damages claimed to have been done before the new stack was built. It is a circumstance that, although no member of the Farmers' Association is a party to this suit, yet the association has been directly responsible for the presentation of the evidence, and, through assessments levied upon its different members has raised funds through a committee. Bliss, the complainant, prior to bringing this suit, put his farm in the hands of Mr. Smith, president of the Farmers' Association, for rental purposes, appears to have paid little attention to the matter, and has not contributed any portion of the expenses of conducting the same, except the rent of his ranch which was turned over to his counsel. He has really given control to the Farmers' Association, in the interest of prosecuting this suit, and has allowed his name to be used to try a 'test case,' admitting that he is the person through whom the other farmers are trying to establish their contentions.

"Mr. Bliss himself refused to consider an offer of purchase made to him in June, 1906, by an agent of the defendant, having given as a reason for such action the pendency of this suit, and that he had yielded management of his place to Mr. K. D. Smith, and to Mr. Clinton, who was counsel for the Farmers' Association.

"Now, inasmuch as we have ascertained that some damage, the amount of which is not susceptible of correct ascertainment from the evidence, has been done to the complainant's farm by the operation of the Washoe Smelter, attention is next appropriately addressed to what, if any, abnormal conditions existed in the Deer Lodge Valley before the evidence in the present suit was submitted, which are due to acts of these defendants? It is established that there was more or less spotting on the vegetation, caused by the smoke from the stack. The spotting is explained by one of the expert botanists as due to the dropping of substances in the smoke stream on the vegetation, which kill the immediate section they fall upon. Technical botanists disagree radically as to the extent of the area so spotted; some called by defendants confining it to within five miles of the stack, while those called by complainant say it was observable as far away as 13 miles northwesterly. By the botanical evidence, including the exhibits, it is made apparent how very difficult to distinguish between the spotting of vegetation by sulphur and certain other injuries, for instance, alkali, sun scald, insect, hail, or fungus growth. To one unskilled in technical plant life, the only way to resolve the divergent views of the scientists is to form an opinion of the existing conditions, as they actually appeared to intelligent, practical farmers and dairymen, and as practical agricultural results may reflect upon the matter, and then to consider and correlate the scientific evidence to such conditions. This I have done with great care, and my best judgment is that there has been no substantial injury done to Mr. Bliss' land, or to the crops thereon, by the sulphur discharged into the atmosphere since the big stack was built, and that there has been no general, substantial, harmful effect from the smoke upon the quantity of the crops produced upon the Bliss or other lands, and that no permanent injury has been done to complainant's or other lands in the valley. There was evidence showing past injuries to coniferous timber on the hills back of the smelter, and it was made quite clear that damage is now being done in the hills right back of the smelter along Mill creek, where the smoke spreads through a draw, the bottom of which approaches the level of the top of the chimney. But, apart from this special damage in this immediate vicinity, the weight of the evidence is to the effect that the principal damage to timber was done before the new stack was operated—some by the fumes, and some, which is attributed to smoke, was done by fires at different times in years gone by.

"Let us now briefly inquire into the conditions of animal life upon the farms within a few miles of the smelter. After the Washoe Smelter commenced to operate, many horses, that were in pastures in the valley, suffered from sore noses. The sore noses were observed in some horses on the Bliss ranch. Stated in ordinary language, the sore nose ailment consists of a sort of ulcer, from one to three inches in length, on the septum in the direction of the upper lip, and appears as if it were produced by a burn, or an irritating medicinal blister, or acid; the ulcer often containing a large piece of dead skin tissue, in a few instances involving the lining membrane of the nose and penetrating the partition between the nostrils. The horses affected, generally speaking, also had garlicky breaths, rough coats, and suffered from diarrhea; some were thin; some were quite easily exhausted; and many appeared to be unthrifty. The ulcers would heal with ordinary stable care, and the animal would nearly always recover if taken away from the valley pastures. Numbers of horses so affected were killed for examination, and post mortem investigations disclosed lesions affecting the stomach, intestines, liver, kidneys, spleen, heart, respiratory organs, and membranes of the brain. Chemical analyses of certain animal tissues were also made by experts, and more or less arsenic trioxide found. Many cattle were affected. None of the cattle had sore noses; witnesses saying that this was because cattle can clean their nostrils with their tongues, while horses cannot. Some of the symptoms manifested in cattle were garlicky breaths, rough coats, coughs, tucked-up bellies, scouring and drooling. Eliminating the sore nose, the lesions found in the cattle examined after death were generally similar to those found in the horses. In one of a number of steers that had been kept by defendants for experimental purposes upon the Bliss pastures, which was killed for examination by Dr. Formad, of the government

service, there were found vascular changes, epithelial changes, and connective tissue changes which were evidently caused by irritant poison.

"By again reasoning from facts seen and testified to by plain witnesses, and weighing what things were so actually seen with what experts have said and with what experiments have been made, out of the mass of evidence I must conclude that the lesions observed were caused by the irritant or corrosive poison arsenic. This arsenic was deposited to a greater or lesser extent upon the fodders of the pastures, and when ingested by live stock caused ailment and sickness. The most rational view is that the volume of the smoke stream with its arsenic contents is at times carried by air currents upon the lands adjacent to the smelter; that sometimes the volume is much more dense than at other times, depending upon atmospheric conditions; but that when the smoke is dense and low there is a precipitation of more or less arsenic upon the fields; that a sufficient quantity is precipitated to poison the pastures; and that animals feeding thereon are poisoned. Naturally, owing to variable winds, there is no rule of distribution of the smoke, so that there is no uniform extent of the results of the smoke upon animal life. Hundreds of animals which grazed in the vicinity near to the smelter have never shown the slightest symptoms of poison; cows in the city of Anaconda have thrived in the highest degree; perhaps but a few animals out of a large number grazing in the same field have been affected at all. Yet, after all, when the facts as well as expert opinions are assembled and harmonized, the strength of the whole proof is such that it practically excluded any general cause for animal *unthriftiness* other than arsenical poisoning.

"But, while the conclusion just reached is the only accurate one under the evidence, still it must not be taken that it has been arrived at without overruling a strong challenge to every single issue pertaining to live stock conditions. To some of these matters it is proper to advert briefly. For instance, it is not to be inferred that the complainant has sustained his contention that the sickness in animals has been fatal, or that it has been so general through the Deer Lodge Valley as to make the raising of live stock either impossible or unprofitable in all parts thereof. Complainant called as witnesses less than half of the farmers in the Farmers' Association; whereas, defendants introduced the testimony of a number of farmers, not members of the association, who have lived for years in the vicinity of the smelter, within the so-called 'Smoke Zone,' and who said that they had had no trouble with their stock or crops since 1903, and that their ranches were profitable. Nor can it be doubted that, upon the cross-examination of many of complainant's witnesses, it developed that there had been not a little confusion between live stock conditions which existed prior to 1903 and those that have existed since. These dates are most material, because without doubt great damage was done by the smoke before 1903 (partly to remove the cause of which the smelter was remodeled, and the high stack built), and because the gist of the present suit is to close the smelter to prevent future damage reasonably certain to continue.

"It would appear, too, as showing that the sickness is not fatal, that, notwithstanding the somewhat abnormal condition of animal life that has existed since 1903, the percentage of death rate among live stock through the valley in 1906 was normal, in that, out of about 9,384 head of cattle and 1,632 horses accounted for, the total loss was 54 cattle and 38 horses. Animals seem to sicken slowly, and often fail to show their true condition without careful examination. As apposite to this statement, the student of animal diseases and of pathology and toxicology will be especially interested in reading of the elaborate experiments made by the experts in the case, and will be enlightened by the precision of learning displayed in their testimony. But it is the whole evidence, lay and expert, practical and theoretical, that has led to the finding of arsenical poisoning, as heretobefore ascertained.

"A fair conclusion of the fact is that there has been exaggeration by some of the complainant's witnesses of conditions since 1903, and, as already indicated, much carelessness of statement in defining injury done before and since the new stack was put into use. It is to be remarked, too, that the evidence tends to show an improvement in animal conditions in 1906 over 1905, but exactly why this is so does not appear. It may be that there is

less stock near to the smelter, and that the animals that were poisoned in 1903, before the new stack was built, continued to be ill through 1904 and 1905, and then recovered, or it may be that in 1906 defendants, by the construction of another arsenic furnace, or otherwise, took additional measures to eliminate arsenic from the flue dust at the smelter. No satisfactory reason can be gathered, and the mere fact that there was a betterment was left standing, not to be overlooked, though among the things that aid in final solution.

"Fortunately, I have been helped to a better understanding of much of the testimony in the record—indeed, of the whole case—by a visit of two days to the valley, during which time I rode many miles in an automobile in various directions from the smelter. The trip was made in. August, 1905, in company with the master in chancery, counsel for complainant and defendants herein, and one or more expert witnesses for the respective litigants. As I had asked the several counsel to call my attention to anything they thought worthy of particular notice, it is fair to say that I had an excellent opportunity to gain a general, though, of course, somewhat superficial, insight into conditions. Upon the first day, which was bright, the smoke from the big stack rose high into the air, and seemed to be carried far away, so high that its diffusion would seem to have been too general to do injury to any land; but on the second day the weather was rainy and the clouds were lower. The smoke then was more dense, and its stream was carried down toward the Bliss ranch and southerly, and northerly for a few miles toward the center of the floor of the valley, and was there dissipated. The trip impressed one main thing very firmly upon me that neither the eye nor the training of an experienced or scientific agriculturalist was required to ascertain. It was that the allegation of complainant's bill, to the effect that the Deer Lodge Valley and the country adjacent to the smelter is barren and desert like, is grossly inaccurate. It is true that the land and vegetation lying within, say, a quarter of a mile of the smelter, is visibly affected. But outside of this limited area there was the appearance of healthy, natural conditions of successful cultivation and of such crop growths as are usually seen in the valleys of the state. The harvest was going on. We saw hundreds of healthy looking shade and fruit trees about farm houses, while the grain fields and pastures looked as others in Montana generally do during or just after harvest. We walked over a portion of complainant's place, noticed the foxtail and inferior quality of the grasses growing; and, except for the smoke on the second day, there was nothing in the physical appearance of the complainant's farm or the valley that indicated unusual or abnormal conditions. Prof. Jones, of Utah, one of the botanical experts, representing complainant. showed me some spots on vegetation just beside the smelter, and in gardens upon ranches and also upon some leaves of trees growing on a ranch about 10 miles away, which he said were due to smoke. I saw spots also upon apples on the trees at another ranch; but there is evidence tending to show that the marks on the fruit were due to hail. We saw cattle and horses in the fields and particularly noticed a number of fine, looking cows within the pasture on complainant's place. My attention was also called to several horses that had been driven into a corral at the Staffanson ranch for me to see; one or two had sore noses, and one or more sick and paralyzed; but just when these animals became sick is uncertain, for a witness called by the defendants testified concerning them as follows:

" 'Q. Did you see some horses that were exhibited to Judge Hunt that had sore noses on that trip?  A. I saw a bunch of horses in Mr. Staffanson's corral that they had picked especially, I think, for Judge Hunt's benefit, that they showed there, and I saw Dr. Cheney point out a black horse that we paid Hi Staffanson the full price for as a horse being 'smoked,' when Judge Hunt was with us.  Q. When had the companies paid for that horse?  A. they paid for it some time in 1903, paid Staffanson.  Q. Was this collection of prize horses the derelicts that had been left over from 1902 and 1903?  A. I know some of them were.  There was a brown mare from Tom Boland's, that we paid Duncan for.  That was one of the left over horses.  And several there from Mr. Staffanson's I could not name them, that had been set-

tled for. They had evidently picked every poor horse in the country that they could get, and brought to that corral. They did not show any good ones, though there were some in the stable.'

"I also saw a small band of cattle that were at a corral in another part of the valley. A few of them looked unthrifty and as if they had not shed their winter coats.

"The purely equitable defenses next demand attention. To particularize some facts: When the site of the old works was chosen, the land now occupied by the city of Anaconda was vacant and unoccupied; but, at the time of the commencement of the construction and the employment of many persons in the construction work, a community was established, and in time the city of Anaconda grew until it now has a population of about 12,000. This city owes its growth and prosperity to the conduct of the smelting business at the Washoe Smelter, and its population is dependent for subsistence, directly or indirectly, upon the continued operation of the smelter. It is a well-built city, where many people have made homes for themselves; has a superior class of business buildings; and had an assessed valuation in 1906 of $3,300,000. The people living there have made their investments, believing that the smelting works would continue to operate, and, as would be natural, the products of the Deer Lodge Valley—hay, vegetables, garden truck, grain, alfalfa, live stock, and other farm products—have generally found ready market at good prices in Anaconda. In 1905, though, there were some complaints made against Deer Lodge Valley hay, and sales were not as ready as they would have been had buyers not believed the hay was 'smoked'; but in 1906 there was quick sale for it all at current market prices.

"It is proven that, even if the defendants could find a more suitable location for the smelter in order to avail themselves of it, a new railroad track system would have to be built to convey the ores from the mines at Butte, and, in the construction of new works which would take five years to build, the salvage from the present plant would not be worth more than a million dollars. Furthermore, the natural advantages for a smelting plant, on account of the favorable grades from the mines at Butte to the Washoe Smelter, and on account of the water and lime rock and other facilities necessary in the economical and profitable operation of a smelting plant, could not be found elsewhere, and, as a result, transportation cost would be increased, and mining of a very large percentage of the ores now treated at the Washoe Smelter could not be successfully carried on. No known site exists in Montana where the operations of the Washoe Smelter can be carried on with less damage and inconvenience to surrounding property and inhabitants than the present site.

"As further evidence of the importance of the defendants' works to the communities of the state, it is proven that the total assessed valuation of the property in Deer Lodge county, within which Anaconda is situated, in 1904, was $8,120,826; that of such amount $4,058,573 was assessed against the property of the defendants; that from 1902 to 1906 the defendants have paid more than 51 per cent. of the total taxes of the county; and that if an injunction were to be issued, as prayed for, the property of the defendants would be practically valueless, and necessarily there would be such a reduction in the assessable property within the county as to make it impracticable to continue the county organization of Deer Lodge county.

"To show the great harm that would be done by the closing of the smelter, it is established that Butte, with a present population of over 70,000, has grown within the last 30 years from a mining camp, because of the development of the copper mines, many of which belong to and are operated by the defendants herein. Practically the whole population of Butte depends upon the continued operation of the copper mines, and about two-thirds of all of the ores mined at Butte are treated and reduced at the Washoe Smelter.

"The effect of stopping the works at Anaconda would be to deprive Silver Bow county, wherein Butte is situated, of at least 30 per cent. of the total taxes collected, and as a consequence there would be a great depreciation in the value of all property in that county, which is now subject to assessment,

and that, because of the revenues paid to the state by the counties of Silver Bow and Deer Lodge, the income of the state would be materially affected.

"It is in evidence, also, that the defendants use vast quantities of coal, coke, and lumber, which are supplied from points within Montana, other than Butte and Anaconda, and that in supplying them employment to a large percentage of the population is furnished; that during 1906 there were 4,548 men employed in the mines which furnished ore to the Washoe Smelter; that in the same year there were about 2,500 men employed in the reduction works; that the railroads operating within Montana derive their earnings largely from the freight handled in connection with the operations of the defendant companies; that in the first six months of 1906 the defendant companies paid to the men employed directly by them, including the money paid out by the companies which ship ores for treatment to the Washoe Smelter, over $5,000,000; that the railroad freight paid during the first six months of 1906 exceeded $1,400,000; and that the defendant companies paid out for material, largely furnished from different points within Montana and elsewhere, yearly amounts of about $4,000,000.

"As further evidence of the magnitude of the interests involved, it appears that the defendants' works, since 1902, have expended over $7,000,000 in labor, over $4,000,000 for coal, over $4,000,000 for coke, over $740,000 for lime rock, over $1,300,000 for machinery, and over $53,000 for lumber; that up to June 30, 1906, the ores treated at the Washoe Smelter yielded over 590,000,000 pounds of copper, over 25,000,000 ounces of silver, and over 164,000 ounces of gold; and that annually from 17 to 20 per cent. of the supply of copper in the United States has been produced by the Washoe Smelter."

R. L. Clinton and C. M. Sawyer, for appellant.

C. F. Kelley and L. O. Evans, for appellees.

Before GILBERT, ROSS, and MORROW, Circuit Judges.

ROSS, Circuit Judge (after stating the facts as above). [1] The enormous record in the case, consisting as it does of about 25,000 printed pages, renders it wholly impracticable to review the evidence in detail. We have, however, given the record the careful consideration the importance of the case demands and deserves. Upon every essential point relied upon by the complainant the evidence is conflicting in the extreme sense. We regret that it is not practicable to set forth examples of this, and, indeed, undertook to do so, but found that it could not be done with any reasonable limit to the opinion. We shall therefore confine ourselves to a brief statement of the reasons upon which we base our judgment. While there is much evidence on behalf of the complainant tending to sustain his allegations in respect to the damage done to his land and stock by emanations from the defendants' smelter, as well as to that of many farmers within that portion of Deer Lodge Valley referred to as the "Smoke Zone," and as to the alleged continuing and destructive effect of such emanations, there is also a large amount of testimony and other evidence tending to show that since the remodeling of the Washoe Smelter, in 1903, no appreciable damage has been done by its operations either to the land or stock of the complainant, or to that of the farmers within the zone in question. Under such circumstances, we do not think an appellate court can be reasonably expected to reverse the findings of fact made by the trial judge, substantially confirming those made by the standing master of the court, who had the benefit of seeing the witnesses on the stand, and

especially when both the master and the judge had the benefit of a personal view of the premises.

In Crawford v. Neal, 144 U. S. 585–596, 12 Sup. Ct. 759, 762 (36 L. Ed. 552) the Supreme Court said:

"The cause was referred to a master to take testimony therein, 'and to report to this court his findings of fact and his conclusions of law thereon.' This he did, and the court, after a review of the evidence, concurred in his findings and conclusions. Clearly, then, they are to be taken as presumptively correct, and unless some obvious error has intervened in the application of the law, or some serious or important mistake has been made in the consideration of the evidence, the decree should be permitted to stand."

To the same effect are the cases of Camden v. Stuart, 144 U. S. 104, 12 Sup. Ct. 585, 36 L. Ed. 363; Tilghman v. Proctor, 125 U. S. 136, 8 Sup. Ct. 894, 31 L. Ed. 664; Kimberly v. Arms, 129 U. S. 512, 9 Sup. Ct. 355, 32 L. Ed. 764; Evans v. State Bank, 141 U. S. 107, 11 Sup. Ct. 885, 35 L. Ed. 654; Furrer v. Ferris, 145 U. S. 132, 12 Sup. Ct. 821, 36 L. Ed. 649; Davis v. Schwartz, 153 U. S. 631, 15 Sup. Ct. 237, 39 L. Ed. 289. Especially should this rule be adhered to where, as in the present case, the trial judge, as well as the master, had the benefit of a personal inspection of the premises. McCarthy v. Bunker Hill & Sullivan Mining Co., 164 Fed. 927–940, 92 C. C. A. 259.

The fairness of the trial judge, as well as of the master, in the trial and decision of the case, is vigorously challenged by the counsel for the appellant, and they urge upon us to protect the farmers in their homes and rights against what they assert to be the wrongs and oppressions of wealthy mining corporations. This court is always ready and willing to do that in all proper cases. The writer is himself a farmer, and has been for more than 40 years; but the fact must be recognized that there are two sides to almost every case—certainly there are two sides to this one—both of which must be carefully considered in order to reach a just result. That, we think from the record, was carefully and impartially done by the learned judge of the court below, as shown by his opinion rendered in the cause. There is nothing in the record tending to show any unfairness either on his part or on the part of the master, and, regarding the former, his fairmindedness and high personal character are well known to us from association with him while he was upon the federal bench in this circuit. The record shows that so anxious was the trial judge to do exact justice between the parties, that after announcing his conclusion that the injunction should be denied, thinking it might be possible for the defendant companies, by the construction of some additions to their plant, or that some new method might be devised and put into effect by which the slight damage which he found to exist from its operation might be reduced or entirely overcome, the court retained the cause for the purpose of taking further testimony in respect to that matter, giving each party an opportunity to present such evidence as they might be able to obtain within a stated time, and after hearing such evidence as was presented by the defendants—the complainant failing to produce any—found that the defendants had taken every precaution possible to prevent any deleterious effects from the operation of their plant, and accordingly entered final judgment.

The record shows that less than one-third of the farmers of Deer Lodge Valley side with the complainant in his contention, and that the testimony of many of the farmers within the "Smoke Zone" is to the effect that since the remodeling of the smelter in 1903 there has been no appreciable damage done to the crops or stock of the farmers in that territory. Counsel for the complainant seem to think that all such witnesses were in some way under the control or in the interest of the defendants to the suit, and, indeed, that all of the testimony of the numerous witnesses, to the effect that since the remodeling of the smelter no appreciable harm has resulted to the crops or stock of the farmers, is either false or entirely unreliable. We cannot so hold. A number of the witnesses for the defendants who, in effect, so testified, are men of national, and some of them of international, reputation in respect to the subjects upon which they testified, and the positions respectively held by them are good evidence of their personal character. And with respect to the farmers who testified on behalf of the defendants, how can we know or be reasonably expected to hold that they are any the less truthful and reliable than the farmers who testified on behalf of the complainant? It has been said that in the nature of things the enormous quantity of sulphur and arsenic thrown into the atmosphere by the stack of the defendants' smelter must find lodgment somewhere, and much reliance is placed by the complainant's counsel on the testimony of his principal chemical expert, Dr. Swain. Without regard to the expert testimony on behalf of the defendants tending to show that it was impossible to ascertain with any degree of accuracy the volume or contents of the smoke stream issuing from the defendants' smelter by reason of its varying physical condition, due to changes of temperature and the different velocities the smoke stream moved in different portions of the stack for various reasons, we make brief reference to some of the testimony of Dr. Swain. He undertook to ascertain the contents of the smoke stream and gave as a result of his experiments the smoke velocity as 55.92 feet per second, the volume of smoke for 24 hours 2,340,000 cubic feet, which he reduced to 2,000,000 cubic feet as eminently fair. He calculated the $As_2O_3$ for 24 hours as 48,100 pounds, reduced as a reasonable estimate to 44,000 pounds, and gave as analysis of his smoke sample 10.9 millimeters of arsenic per cubic foot of smoke. Being asked how he measured the volume of smoke that he analyzed, the witness answered:

"A. The volume of smoke was determined by inserting into the stack, to a distance exactly equal to the distance we inserted the sampling tube—two iron pipes leading to what is known as 'Pitot tube.' This Pitot tube has one aperture directed downward in the opposite direction to the smoke stream, two other apertures, which are slits inside of the tube, lateral to the smoke stream, and thus connected separately to a glass U-tube carrying ether, and, by using this maometer, we measured the change, for in the ether column we had a measure of the pressure of the moving mass of gas. By using a formula proved to be correct, we converted pressure into terms of velocity feet per second, and then a mathematical calculation based on the temperature of the stack gives the feet per second passing at the point in the stack opposite our apparatus. A simple calculation also gives us the volume per 24 hours thrown out."

He gave as the diameter of the tube through which the smoke was drawn as $3/16$ of an inch, and the diameter of the stack as $33\frac{1}{3}$ feet.

He admitted some errors in his work, and stated that there are necessarily errors in such work, but also testified that he had allowed for errors in his final reasonable estimate. He testified, also, in effect, as stated by the court below, that the slightest mistake in the chemical analysis in trying to arrive at the amount of arsenic would be multiplied by millions and millions. He testified, also, that he did not know in how many different forms arsenic was present in the smoke, and that its ill effect would depend upon the poisonous character of the arsenic and be measured by the solubility of the substance in water and digestive juices. Being asked the question:

"When the smoke would be distributed over the Deer Lodge Valley, so as to envelop the same with the trioxide of arsenic ingredients contained in it, which you have testified to, what, in your opinion, would be the effect or condition arising from the smoke as it passed over and enveloped the Deer Lodge Valley—in so far as this arsenic or trioxide of arsenic is concerned?"

He answered:

"A. I would expect a partial deposition of the solid substance.
"Q. On the lands?
"A. On the surface exposed.
"Q. Well, do you mean by that, Doctor, that a part of the solid bodies and trioxide of arsenic, in whatever form it might be, would remain continuously in the atmosphere, or would it finally all be deposited somewhere?
"A. That is not a reasonable assumption, I think, to believe that it would be permanently suspended; but no man has a measure of the rate of deposition of the finely divided solid particles from the atmosphere.
"Q. Then your opinion would be that sooner or later it was all to be deposited somewhere; that is, precipitated?
"A. That is a perfectly sound and reasonable assumption."

[2] Taking the testimony of Dr. Swain, regardless of that of the expert witnesses of the defendants on the same subject, we think it far too indefinite and uncertain to overcome the findings of the court to the effect that since the remodeling of the smelter in 1903 the emanations have only affected the property of the complainant and the other farmers within the "Smoke Zone" in a very slight degree. Accepting those findings, as we must, we think the judgment denying the injunction prayed for and remitting the complainant to an action at law for such damages as he has really sustained should be affirmed, under the established doctrine of the Supreme Court of the United States and of this court to the effect that in such cases it is proper to consider all of the facts and circumstances of the case in order to determine the equities, including comparative damages, where, as in the present case, it is sought to enjoin a lawful business, and to withhold the writ where it appears that it will necessarily operate contrary to the real justice of the case. See Parker v. Winnipiseogee Lake & Woolen Co., 67 U. S. 545–552–553. 17 L. Ed. 333; New York City v. Pine, 185 U. S. 93, 22 Sup. Ct. 592, 46 L. Ed. 820; Kansas v. Colorado, 206 U. S. 46, 27 Sup. Ct. 655, 51 L. Ed. 956; Georgia v. Tennessee Copper Co., 206 U. S. 230, 27 Sup. Ct. 618, 51 L. Ed. 1038; Mountain Copper Co. v. United States, 142 Fed. 625, 73 C. C. A. 621; McCarthy v. Bunker Hill & Sullivan Min. Co., 164 Fed. 927, 92 C. C. A.

259; Bonaparte v. Camden, etc., R. R. Co., Fed. Cas. No. 1,617; Edwards v. Allouez Min. Co., 38 Mich. 46, 31 Am. Rep. 301.

The judgment is affirmed.

In view of the importance of the case and the size of the record, we direct that our mandate be stayed for six months to enable the appellant to apply to the Supreme Court for a writ of certiorari should he so desire.